UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

EARTH ISLAND INSTITUTE,
a non-profit organization,

NO. CIV. S-09-2020 FCD/EFB

            Plaintiff,

      v.                              MEMORANDUM AND ORDER

ALICE B. CARLTON, in her
official capacity as Forest
Supervisor for Plumas National
Forest, RANDY MOORE, in his
official capacity as Regional
Forester for Region 5 of the
United States Forest Service,
and the UNITED STATES FOREST
SERVICE,

            Defendants.

----oo0oo----

      This matter is before the court on plaintiff Earth Island

Institute's ("plaintiff" or "EII"), a non-profit organization,

motion for a preliminary injunction, enjoining the United States

Forest Service ("FS") from implementing any and all aspects of

the Moonlight-Wheeler Fire Recovery and Restoration Project

("Moonlight-Wheeler Project" or the "Project"), including the

felling, removal and/or selling of any trees.[1]  The Project would log dead mature and old growth trees on 14,755 acres of forest and live mature and old growth trees along 123 miles of roads affected by the 2007 Moonlight fires on the Plumas National Forest ("PNF").  Plaintiff asserts that much of the logging would involve clearcutting in what ecologists consider to be one of the most important and endangered forest habitat types, burned forest ecosystems, which are rare due to decades of fire suppression and post-fire salvage logging on private and public lands.

More specifically, plaintiff contends that the Moonlight-Wheeler Project would destroy thousands of acres of heavily burned "snag forest habitat" upon which the imperiled Black-backed Woodpecker ("BBWO") depends for survival and would threaten this rare bird with extinction in the Sierra Nevada.  In addition, plaintiff contends the Project would also remove thousands of live mature and old growth trees under the ruse of public health and safety; species such as the California Spotted Owl ("CSO") would be adversely affected not only by the removal of green forest habitat and individual large dead trees ("snags") that would otherwise be used as potential nesting, perching and roosting sites, but also by the removal of heavily burned forest habitat, which provides for abundant prey to the owl and increases its ability to survive and produce offspring.  Finally, plaintiff maintains that ground-based tractor logging on recovering but fragile post-fire soils would cause extreme soil

---

[1]    EII filed its complaint on July 21, 2009; on July 24, 2009, the parties stipulated to an expedited briefing schedule and hearing on the motion.

1   damage, erosion, and watershed effects.  Plaintiff contends that

2   absent this court's order enjoining defendants'[2] proposed

3   logging, this significant irreparable harm will occur without the

4   proper observance of law, pursuant to the National Environmental

5   Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the

6   National Forest Management Act ("NFMA"), 15 U.S.C. § 1601 *et*

7   *seq.*, and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C.

8   § 730(a).

9       Defendants argue, to the contrary, that they have complied

10  with all relevant laws, and that the Project responds to the

11  catastrophic conditions caused by the Moonlight and Wheeler fires

12  by removing hazardous trees from roadways and facilities,

13  recovering the value of fire-killed trees in high severity burn

14  areas, and planting native conifer seedlings to reestablish

15  forested conditions in areas under threat of being dominated by

16  shrubs.  Defendants assert that the balance of hardships tips in

17  their favor and that an injunction is not in the public interest

18  because with each passing day, the risk that someone will be

19  killed or seriously injured by a falling hazardous tree increases

20  due to advancing deterioration, and compounding the urgency

21  caused by the increasing safety risk is the declining economic

22  value of the trees.  Also, defendants argue an injunction would

23  harm, not advance, the struggling local economy as well as delay

24  the benefits of the planned reforestation efforts which includes

25  planting native conifer seedlings to expedite forest

26

27         [2]   The named defendants are Alice B. Carlton, Forest

28  Supervisor for the PNF, Randy Moore, Regional Forester for Region
5 of the FS, and the FS.

regeneration, recover forested conditions and prevent domination

of shrub species.

The court heard oral argument on the motion on August 7,

2009.[3]  By this order, it now renders its decision on the motion,

denying plaintiff's motion for a preliminary injunction.  For the

reasons set forth below, the court finds that plaintiff has not

shown a likelihood of success on the merits of its claims against

defendants pursuant to NEPA, NFMA or the MBTA or a likelihood of

irreparable harm nor that the balance of equities tip in its

favor or that the public interest is best served by enjoining the

Project.

## BACKGROUND

The Moonlight and Wheeler fires burned through portions of

the Plumas and Lassen National Forests in the summer of 2007,

creating a contiguous fire area of approximately 88,000 acres

that burned at varying levels of fire intensity.  The Wheeler

fire was started by lightning.  The Moonlight fire started on

private lands during a logging operation and burned onto the

adjacent PNF.  In total, of the acres burned by the Moonlight and

---

[3]   At the conclusion of the hearing, the court requested
that the parties supplement their oral arguments by a written
submission to be filed on or before August 12, 2009.  (Docket
#s 50, 51.)  Defendants' submission was particularly helpful to
the court in identifying the specific portions of the record that
supported defendants' arguments.  (Docket #50-2.)
   Pursuant to the Record of Decision issued by the FS,
the Project was set to commence August 12, 2009; however, at the
hearing, the FS stipulated on the record to stay the Project
until August 21, 2009 to allow the court additional time to
render its decision.  The court indicated it would issue its
decision on or before August 21, 2009.  Even with this extension,
however, the court had 15 days, after briefing was complete, to
review the voluminous record, consisting of thousands of pages of
documents, and render its decision.

Wheeler fires, approximately 78% was on the PNF and 22% was on private land.   The fires burned approximately 41,000 acres of National Forest land with high severity such that "it resulted in a deforested condition characterized by relatively large areas of standing dead trees," "where seed source of desired species is insufficient to naturally regenerate these areas."   (Thrower Decl., filed July 31, 2009, Ex. 1 at 3.)

In response to this alteration of the forest resource conditions, the FS recognized the need to undertake a combination of management activities, including both restoration and timber harvest.   The Forest Service therefore proposed the Moonlight-Wheeler Project to address several purposes: (1) to "remove hazardous trees with structural defects" that pose a safety risk to the public and FS employees along a 123-mile stretch of National Forest road; (2) to "recover the value of fire-killed trees before natural deterioration occurs . . . and provid[e] a wood supply for . . . sustaining a part of the employment base in rural communities;" and (3) to plant native conifer seedlings to expedite forest regeneration, recover forested conditions and prevent domination of shrub species. (Id. at Ex. 1 at 2-3, 15.)

Ultimately, the Moonlight-Wheeler Project would log 14,755 acres of forest that burned at high intensity.   Most of the area burned on private lands has already been logged (over 11,000 acres since 2007). (Voss Decl., filed July 24, 2009, Ex. B [RFEIS, Appx. B at B-6, Table B-2].)

Previously, in June of 2008, EII filed an administrative appeal of the related "Moonlight Roadside Logging Project"

5

1  decision.  On August 14, 2008, the FS's Regional Office affirmed

2  the PNF Supervisor's decision on that project.  On August 20,

3  2008, EII brought a challenge in this court to the Moonlight

4  Roadside Logging Project and on September 2, 2008 moved for a

5  preliminary injunction.  On October 31, 2008, the parties entered

6  into a stipulation, in which the FS agreed to evaluate the

7  Moonlight Roadside Logging Project in a Revised Draft

8  Environmental Impact Statement ("RDEIS") for the larger

9  Moonlight-Wheeler Project.

10       On April 6, 2009, plaintiff submitted extensive timely

11  comments on the Moonlight-Wheeler RDEIS, including comments from

12  scientists and complete copies of scientific literature for the

13  FS to review.  On June 16, 2009, the FS issued its Revised Final

14  EIS ("RFEIS").  The RFEIS considers five alternatives in detail:

15  the no-action alternative (Alternative B); three action

16  alternatives (Alternatives A, C, D) involving a combination of

17  timber harvest, hazard tree removal, and restoration activities;

18  and a fifth action alternative (Alternative E) consisting of

19  hazard tree removal and restoration activities only.  (Thrower,

20  Ex. 1 at 11-26.)  Six other alternatives were considered,

21  including one proposed by plaintiff but it was eliminated from

22  detailed study for various reasons.  (Id. at 27-33.)

23       On June 29, 2009, the outgoing Chief of the FS authorized an

24  Emergency Situation Determination ("ESD"), which allows the FS to

25  implement the Moonlight-Wheeler Project as soon as the Record of

26  Decision ("ROD") is signed.  The FS Chief found that an ESD was

27  appropriate given the "threats to public and employee safety" and

28  that any delay in implementation of the Project would "result in

6

1  substantial loss of economic value." (Id. at Ex. 2.)
2  Additionally, the Chief found that delay "would jeopardize other
3  restoration and recovery objectives including fuel reduction,
4  erosion control, and reforestation." (Id.)

5      On July 20, 2009, the FS signed the ROD for the Moonlight-
6  Wheeler Project, adopting Alternative A for implementation.
7  (Voss Decl., Ex. A.)  The ROD identified Alternative A as the
8  alternative that "best meets the needs identified for this
9  project" and as "consistent with the goals and objectives of the
10 [Plumas National Forest Land and Resource Management Plan ("PNF
11 LRMP")]."  (Id. at Ex. A at 4.)  The selected alternative
12 authorizes timber harvest of fire-killed trees on approximately
13 10,366 total acres of the 41,290 acres of high vegetation burn
14 severity areas using ground based, skyline, and helicopter
15 harvest methods.  (Id.)  In addition, harvest of fire-killed or
16 dying (fire-injured) conifer hazard trees is authorized on 4,389
17 acres along 123 miles of road.  (Id.)  Reforestation authorized
18 by the decision includes 16,006 acres of conifer seedlings.
19 (Id.)  The decision also authorizes the construction of up to 19
20 miles of temporary road and 14 helicopter landings (30 acres),
21 which will be decommissioned after use.

22     On July 21, 2009, plaintiff filed this case, asserting
23 claims for relief pursuant to NEPA, NFMA and the MBTA.  More
24 specifically, plaintiff alleges the following nine claims for
25 relief: (1) Violation of NFMA for the Failure to Comply with the
26 Plumas Forest Plan Guidelines for Hazard Tree Removal;
27 (2) Violation of NFMA for the Failure to Conduct Monitoring and
28 Ensure the Viability of the BBWO; (3) Violation of NFMA for the

Failure to Comply with the Forest Plan's Population Monitoring
Requirements for Species at Risk ("SAR"); (4) Violation of NFMA
for the Failure to Ensure that the Logging will not Result in
Irreversible Damage to Soils and Watersheds; (5) Violation of
NEPA for the Failure to Ensure Scientific Accuracy and Integrity
and Disclose Methodology in an EIS; (6) Violation of NEPA for the
Failure to Meaningfully Respond to Dissenting Scientific Opinion;
(7) Violation of NEPA for the Failure to Consider, Explore and
Objectively Evaluate a Reasonable Range of Alternatives;
(8) Violation of NEPA for the Failure to Take a Hard Look at
Impacts of the Project; and (9) Violation of the MBTA for the
Failure to Prevent the Direct Killing of Birds from Authorized
Logging Activities.  (Docket #1.)

As of July 30, 2009, the FS has awarded two timber sale
contracts on the Project and continues to evaluate bids.  The FS
expects to award three additional contracts.[4]  (Carlton Decl.,
filed July 31, 2009, ¶ 29.)

By the instant motion for preliminary injunction, plaintiff
seeks an order enjoining the FS from implementing any and all
aspects of the Moonlight-Wheeler Project, including the felling,
removal and/or selling of any trees.  In so moving, plaintiff
concedes that defendants may fell and leave trees or remove
naturally fallen trees to the side of the roadway under emergency
circumstances pursuant to 36 C.F.R. § 220.4(b)(1).  Plaintiff
asks, however, that the court order that defendants shall not

_____

[4]    While the FS stipulated to stay implementation of the
Project until August 21, 2009; it sought, and received the
court's permission, to continue to award contracts on the Project
during the stay.

8

remove or sell trees from the Project area felled under this
exception.

**STANDARD**

**A.   Preliminary Injunction Standard**

In _Winter v. NRDC_, 129 S. Ct. 365, 374-75 (2008), the United
States Supreme Court clarified the standard for granting a
preliminary injunction:  A plaintiff seeking a preliminary
injunction must establish that: (1) it is likely to succeed on
the merits of its claims; (2) it is likely to suffer irreparable
harm in the absence of preliminary relief; (3) the balance of
equities tips in its favor; and (4) an injunction is in the
public interest.  The Court made clear that even where a
plaintiff has shown a strong likelihood of success on the merits
of its claims, the plaintiff still must show a likelihood of
irreparable harm--the mere possibility of irreparable harm is
insufficient.  _Id._ at 375-76 (holding that "[i]ssuance of a
preliminary injunction based only on a possibility of irreparable
harm is inconsistent with [the Court's] characterization of
injunctive relief as an extraordinary remedy that may only be
awarded upon a clear showing that the plaintiff is entitled to
such relief").

The Ninth Circuit applied the _Winter_ test in _Am. Trucking
Ass'ns, Inc. v. City of Los Angeles_, 559 F.3d 1046, 1052 (9th
Cir. 2009), emphasizing that "to the extent our cases have
suggested a lesser standard, _they are no longer controlling_, or
even viable." (Emphasis added.)  Despite this express direction,
plaintiff argues here that, in the alternative, it is entitled to
preliminary injunctive relief upon a showing of a likelihood of

9

irreparable injury and simply serious questions going to the merits of the case; plaintiff relies on a district court opinion, <u>Save Strawberry Canyon v. Dept. of Energy</u>, 613 F. Supp. 2d 1177 (N.D. Cal. 2009), decided *before* <u>Am. Trucking</u>, and an unpublished Ninth Circuit decision, <u>Greater Yellowstone Coalition v. Timchak</u>, No. 08-36018, 2009 WL 971474 (9th Cir. April 10, 2009), decided three weeks after <u>Am. Trucking</u>.  In both of these cases, the courts cited <u>Winter</u>'s four element test but held that preliminary injunctive relief could be granted based on the Ninth Circuit's alternative "sliding-scale" test; thereunder, the Ninth Circuit had recognized, pre-<u>Winter</u>, that "a preliminary injunction may be granted where the plaintiff 'demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor.'"  <u>Greater Yellowstone</u>, 2009 WL 971474, *1 (citing <u>Save Our Sonoran, Inc. v. Flowers</u>, 408 F.3d 1113, 1120 (9th Cir. 2005)) (emphasis in original).

   <u>Save Strawberry</u> is clearly inapposite as it was decided before <u>Am. Trucking</u>.  And, while <u>Greater Yellowstone</u> does support plaintiff's argument, it is of limited precedential value as an unpublished case, and this court finds it otherwise unpersuasive in light of <u>Am. Trucking</u>'s clear holding, which the court in <u>Greater Yellowstone</u> failed to acknowledge.  Not only does the court in <u>Greater Yellowstone</u> cite pre-<u>Winter</u> case law, <u>Save Our Sonoran</u> decided in 2005 for the applicable standards, it fails to cite <u>Am. Trucking</u> at all, despite the fact that it was the first Ninth Circuit case decided after <u>Winter</u> and was issued nearly a month before the decision in <u>Greater Yellowstone</u>.  2009 WL

971474, *1.

Am. Trucking expressly states that the Ninth Circuit's cases suggesting a lower standard than Winter are no longer viable, disapproving of Lands Council v. Martin, 479 F.3d 636, 639 (9th Cir. 2007) which had permitted something less than a showing of a likelihood of success on the merits.  Am. Trucking, 559 F.3d at 1052 n. 10.  Clearly, Greater Yellowstone appears to be a brief unpublished anomaly since the Ninth Circuit's most recently published cases ignore Greater Yellowstone and underscore the requirement of Winter's four prong test.  Sierra Forest Legacy v. Rey, – F.3d –, No. 07-12892, 2009 WL 2462216, *3, 5-6  (9th Cir. Aug. 13, 2009) (reversing district court's denial of motion for preliminary injunction and remanding for consideration of the non-merits factors in Winter, namely, likelihood of irreparable harm, the balance of equities and the public interest); see also Stormans, Inc. v. Selecky, 571 F.3d 960, 977-78 (9th Cir. 2009) (citing Winter's four prong test, without mentioning any alternative, sliding-scale test, or more specifically, the grant of injunctive relief based on a showing of serious questions going to the merits); Marlyn Nutraceuticals, Inc. v. Mucos Pharma GMGH & Co., 571 F.3d 873, 877 (9th Cir. 2009) (accord).

Thus, this court finds that pursuant to Am. Trucking, plaintiff is entitled to preliminary injunctive relief only if it can demonstrate each of the four elements of the test as stated by the Court in Winter.

///

///

///

11

1   **B.   APA Review**

2       Plaintiff brings the instant challenges under NEPA, NFMA and

3   MBTA pursuant to the Administrative Procedures Act ("APA").

4   Thereunder, the court may set aside a final agency action only

5   where the action is "arbitrary, capricious, an abuse of

6   discretion, or not otherwise in accordance with the law."  5

7   U.S.C. § 706.  Review under the APA is "searching and careful."

8   Ocean Advocates v. United States Army Corps of Eng'rs, 361 F.3d

9   1108, 1118 (9th Cir. 2004).  However, the court may not

10  substitute its own judgment for that of the agency.  Id.    In

11  short, the court must ensure that the agency has taken a hard

12  look at the environmental consequences of its proposed action.

13  Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th

14  Cir. 1997).  As part of this inquiry, the court should ask

15  "whether the [] decision was based on a consideration of the

16  relevant factors and whether there has been a clear error in

17  judgment."  Ocean Advocates, 361 F.3d at 1118.  In addition, the

18  court determines "whether the agency articulated a rational

19  connection between the facts found and the choice made."  Id. at

20  1118-19 (quoting Arizona Cattle Growers' Ass'n v. United States

21  Fish and Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001)).

22      Recently, in The Lands Council v. McNair, 537 F.3d 981 (9th

23  Cir. 2008), the Ninth Circuit emphasized a court's proper role in

24  reviewing agency action in an environmental case:[5]  The court

25  _____

26      [5]    Indeed, the court remarked that "in recent years, [the
    court's] environmental jurisprudence has, at times, shifted away
27  from the appropriate standards of review and could be read to
    suggest that this court should play . . . [the] role" of a "panel
28  of scientists that instructs the [FS] how to validate its
    hypotheses . . . [how to] choos[e] among scientific studies . . .

12

reaffirmed that the role of the court is necessarily at its most deferential when assessing the agency's consideration of technical matters. <u>Id.</u> at 993 (recognizing that the court is not to make "fine-grained judgments of [the science's] worth"). The court is to be "'most deferential'" when the agency is "'making predictions, within its [area of] special expertise, at the frontiers of science.'" <u>Id.</u> (citing <u>Forest Guardians v. U.S. Forest Serv.</u>, 329 F.3d 1089, 1099 (9th Cir. 2003)). In that role, a reviewing court is not to entertain a "battle of the experts" when plaintiffs proffer expert testimony to set against the agency's professional judgment. <u>Id.</u> at 1000. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." <u>Id.</u>  Ultimately, the reviewing court must:

> look to the evidence the [FS] has provided to support its conclusions, along with other materials in the record, to ensure the [FS] has not, . . . relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

<u>Id.</u> at 993 (internal quotations omitted). As a "non-scientist," the court cannot impose bright-line rules on the FS regarding particular means that it must take in every case to show

---

., and orde[r] the agency to explain every possible scientific uncertainty." <u>Id.</u> at 988. However, the court in <u>McNair</u> made clear that this is *not* a role the court should play under APA review. <u>Id.</u>

compliance with NEPA's and NFMA's requirements.  Id. at 994-94.

Rather, the "FS must support its conclusions that a project meets

the [laws'] requirements . . . with studies that the agency, in

its expertise, deems reliable.  The [FS] must explain the

conclusions it has drawn from its chosen methodology and the

reasons it considers the underlying evidence to be reliable."

Id. at 994.  The court may conclude that the FS acts arbitrarily

and capriciously only when the record "plainly demonstrates that

the [FS] made a clear error in judgment" in concluding that a

project meets the requirements of NEPA and NFMA.  Id.

**ANALYSIS**[6]

**A.   Likelihood of Success on the Merits**

    **1.   NEPA & NFMA**

NEPA mandates that federal agencies prepare a detailed

Environmental Impact Statement ("EIS") for all "major Federal

actions significantly affecting the quality of the human

environment."  42 U.S.C. § 4332(2)(c).  These statements must

include a description and analysis of the environmental impact of

the proposed action, any adverse environmental effects that

cannot be avoided if the action is implemented, alternatives to

the proposed action, the relationship between short-term uses and

---

      [6]    Defendants filed a motion to strike plaintiff's
declarations filed in support of its motion (Docket #24), arguing
said declarations were inadmissible because they (1) exceeded the
scope of the parties' stipulation regarding briefing on the
motion, (2) offered improper legal opinions and/or (3) were
extra-record evidence not submitted to the agency.  The court,
however, declines to rule on the motion because even considering
the entirety of plaintiff's evidence, defendants still prevail on
the motion.  For the reasons described below, even considering
the objected-to evidence, plaintiff cannot demonstrate a
likelihood of success on the merits of its claims against
defendants or a likelihood of irreparable harm.

14

long-term productivity, and any irreversible or irretrievable commitment of resources that would be involved if the action were to be implemented.  <u>Earth Island Inst. v. U.S. Forest Serv.</u>, 442 F.3d 1147, 1153 (9th Cir. 2006) ("<u>Earth Island II</u>").  "In short, NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action' and 'inform the public that it has indeed considered environmental concerns in its decisionmaking process.'"  <u>Id.</u> (quoting <u>Kern v. U.S. Bureau of Land Mgmt.</u>, 284 F.3d 1062, 1066 (9th Cir. 2002)).

NEPA does not contain substantive environmental standards but instead establishes procedural requirements to ensure that agencies take a hard look at the environmental impacts of their actions.  <u>Earth Island II</u>, 442 F.3d at 1154.  "A hard look includes 'considering all foreseeable direct and indirect impacts.'"  <u>Id.</u> at 1159.  A hard look also includes "a discussion of adverse impacts that does not improperly minimize negative side effects."  <u>Id.</u>  The FS, therefore, must "undertake a thorough environmental analysis before concluding that no significant environmental impact exists."  <u>Id.</u>  In reviewing the adequacy of an EIS, the Ninth Circuit applies the "rule of reason" standard, "which requires 'a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.'"  <u>Native Ecosystems Council v. U.S. Forest Service</u>, 418 F.3d 953, 960 (9th Cir. 2005).

Plaintiff makes two central arguments for why defendants violated NEPA in the preparation of the RFEIS: (1) the FS failed to ensure the scientific accuracy and integrity of the EIS and

15

failed to disclose its methodology in the EIS and (2) the FS
failed to meaningfully respond to dissenting scientific opinion
in the EIS.  Plaintiff makes the former argument with respect to
the following: (a) the FS's alleged inaccurate application of the
roadside hazard tree marking guidelines; (b) the FS's alleged
misrepresentation of the science relating to the BBWO; (c) the
FS's alleged misrepresentation of the science relating to the
CSO; (d) the FS's alleged misrepresentation of the science
regarding snag fall-rates; and (e) the FS's failure to divulge
the methodology used to assess the amount of BBWO habitat
necessary to maintain the viability of the species.  Plaintiff
makes the latter argument, regarding the FS's alleged disregard
of dissenting scientific opinion, with respect to the following:
(a) the roadside hazard tree marking guidelines; (b) the impacts
of logging on the post-fire soils; (c) the viability of the BBWO;
and (d) the benefits of fire for CSOs.

     Under NEPA, "[a]gencies shall insure the professional
integrity, including scientific integrity, of the discussions and
analyses in environmental impact statements.  They shall identify
any methodologies used and shall make explicit reference by
footnote to the scientific and other sources relied upon for
conclusions in the statement."  40 C.F.R. § 1502.24.  In ensuring
the scientific integrity of their discussion and analysis,
agencies "shall discuss at appropriate points in the final
statement any responsible opposing view which was not adequately
discussed in the draft statement and shall indicate the agency's
response to the issues raised."  40 C.F.R. §§ 1502.9(b), 1502.24.
While courts have strictly enforced NEPA's requirement to address

contrary scientific opinion,[7] ultimately, agencies must be given wide discretion in assessing scientific evidence.  Indeed, the Ninth Circuit has recognized:

> [A]n agency's obligation to respond to public comment is limited.  Not every comment need be published in the final EIS.  Nor must an agency set forth at full length the views with which it disagrees.  Moreover, an agency is under no obligation to conduct new studies in response to issues raised in the comments, nor is it duty-bound to resolve conflicts raised by opposing viewpoints.

California v. Block, 690 F.2d 753, 772 (9th Cir. 1982) (citations omitted); Navajo Nation v. U.S. Forest Serv., 479 F.3d 1024, 1057 (9th Cir. 2007); 40 C.F.R. § 1503.4.  At bottom, an agency fulfills its statutory duties when it "take[s] a hard look at the issues and responds to reasonable opposing viewpoints."  Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1301 (9th Cir. 2003) ("Earth Island I").

While NEPA imposes certain procedural requirements on defendants, NFMA imposes certain substantive requirements.  NFMA mandates that the Secretary of Agriculture "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System."  16 U.S.C. § 1604(a).  The FS, which manages the System, develops land and resource management plans pursuant to NFMA, and uses these forest plans to "guide all natural resource management activities," including use

---

[7]   See e.g. Earth Island II, 442 F.3d at 1172-1173 (the FS "cannot assume that simply because the [spotted] owl studies are preliminary, the adverse impacts discussed therein will not occur . . . the FEISs must respond explicitly and directly to conflicting views in order to satisfy NEPA's procedural requirements"); Sierra Nevada Forest Protection Campaign v. Tippin, 2006 WL 2583036, *8 n. 10, *10-14 (E.D. Cal. Sept. 6, 2006) (accord).

of the land for "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1); 36 C.F.R. § 219.1(b). In developing forest plans, the FS must take both environmental and commercial goals into account. See e.g., 16 U.S.C. § 1604(g); 36 C.F.R. § 219.1(a). Forest planning occurs at two levels: forest and project. At the forest level, the FS develops a "Forest Plan," which is a broad, long-term programmatic planning document for an entire National Forest. Each Forest Plan includes goals and objectives for individual units of the forest and provides standards and guidelines for management of forest resources.

Consistent with its obligations under NFMA, in 1993, the FS adopted the PNF LRMP. In 2001, the FS approved the Sierra Nevada Forest Plan Amendment (the "2001 Framework"), which amended the LRMPs for all national forests in the Sierra Nevada, including the PNF LRMP. Then, in 2004, the FS supplemented the 2001 Framework, referred to as the "2004 Framework," which also amended the LRMPs for all Sierra Nevada national forests. Finally, in 2007, the FS amended the 2004 Framework with the Management Indicator Species ("MIS")[8] Amendment ("2007 MIS Amendment"). The Forest Plan and all amendments rely on the 1982 version of the 36 C.F.R. § 219 NFMA regulations. Because the instant Project lies within the PNF, it must be consistent with the PNF LRMP, as amended by the 2001 and 2004 Frameworks as well as the 2007 MIS Amendment.

---

[8]    An MIS species is a bellwether, or class representative, for other species that have the same special habitat needs of population characteristics. Earth Island II, 442 F.3d at 1173.

Plaintiff contends that, here, the FS violated NFMA by failing: (1) to monitor for and ensure the viability of the BBWO; (2) to conduct required population monitoring for SAR; (3) to follow mandatory Forest Plan standards when marking roadside hazard trees; and (4) to ensure that logging would not irreversibly damage soils and watersheds.

Because of the significant overlap in the parties' arguments and the supporting evidence they rely upon, the court will consider below plaintiff's arguments under NEPA and NFMA collectively when they pertain to the same general subject matter. Where plaintiff makes specific arguments only under NEPA or NFMA, the court considers that issue separately.[9]

### a. RHT Guidelines

With respect to the Roadside Hazard Tree Guidelines, contained in the "PNF Roadside/Facility Hazard Tree Abatement

---

[9] At the outset, the court emphasizes that its discussion of the legal merits of plaintiff's claims is heavily constrained by the procedural posture of this case and the standards governing motions for preliminary injunction. As described above, this matter is being heard on an expedited schedule--a schedule which has permitted this court only 15 days from the conclusion of the original briefing to render a decision and just 8 days following the supplemental briefing which the court found necessary. While the record presented to date is extensive, it is by no means a full record nor one in which the parties have argued completely. Indeed, the parties conceded this fact at the hearing. Such is the very nature of preliminary injunction motions. See South Yuba River Citizens League v. National Marine Fisheries Serv., 257 F.R.D. 607, 615 (E.D. Cal. 2009) (recognizing that at the preliminary injunction stage, courts may consider inadmissible evidence because "preliminary injunction proceedings are 'streamlined' and must often occur before the parties can 'obtain and marshal their evidence in a manner that would be proper for a summary judgment hearing or for an actual trial'") (citations omitted). Thus, the court has assessed the record, as it currently stands, under the time constraints and controlling legal standards, which, after Winter, impose a heavy burden on plaintiffs. The basis of the court's findings herein are thus limited accordingly.

Action Plan of 2008" (Voss Decl., Ex. D) (hereinafter, "RHT Guidelines"), plaintiff claims the FS failed to ensure the accuracy and integrity of the RFEIS with regard to the guidelines, failed to meaningfully respond to comments and failed to follow mandatory Forest Plan standards when marking roadside hazard trees.  Plaintiff's first two claims allege NEPA violations and its third claim alleges a NFMA violation.

More specifically, plaintiff contends the FS failed to ensure the scientific accuracy and integrity of the RFEIS because:  (1) the mortality predictions in the RHT Guidelines greatly overstate mortality relative to the database (dervied from Hood, Smith, and Cluck 2007 ("HSC")) upon which the guidelines claim to be based (Royce Decl., filed July 24, 2009, ¶s 9-13, 19, 72-82); (2) the guidelines are designed to be used less than one year post-fire, and are inapplicable to trees that are alive at two years post-fire (such as those in the Project area), and thus, application to trees two year post-fire dramatically overstates the mortality of such trees (Royce Decl., ¶s 14, 25); (3) the guidelines are inapplicable to the HSC database because they do not use the same variables as that database (the guidelines only use crown kill, while the data base used crown kill and cambial kill), the result of which is, again, a profound overstatement of predicted large tree mortality (Royce Decl., ¶s 17-26, 64-71); and (4) the guidelines are strongly contradicted by decades of published scientific research which has consistently found much lower mortality levels than the

guidelines predict (Royce Decl., ¶s 19, 41-63, 72-82).[10]

Defendants argue, to the contrary, that the RHT Guidelines are not scientifically flawed, and the RFEIS contains adequate information supporting the use of the Guidelines.  Through the declaration of their expert, Daniel Cluck ("Cluck"), defendants proffer evidence that the RHT Guidelines were developed using sound scientific data, references and observations.  (Cluck Decl., ¶s 16-26.)  Cluck argues that plaintiff's expert Dr. Edwin Royce's ("Royce") conclusion that the guidelines overstate mortality is based on faulty reasoning.  Id.  For example, Cluck asserts Royce's comparison of his literature selections to the HSC database is flawed because he failed to take into account the different sizes and types of trees being sampled, and he attempted to compare percent crown volume scorched literature with the HSC database based on percent crown length killed.  Id. Furthermore, in response to plaintiff and Royce's contention that the guidelines are inapplicable to the HSC database, Cluck admits that while the most accurate model developed from the HSC database would include all the predictive variables, the model and the guidelines are still very good predictors of tree mortality despite omitting cambial assessment.  (Id. at ¶

_____

   [10]   Plaintiff contends these inaccuracies are made all the worse by the fact that defendants were presented with these issues by Dr. Edwin Royce during the prior litigation over the Roadside Hazard Tree Project (Earth Island Inst. v. Carlton, No. Civ. S-08-1957 FCD/EFB), as well as during the comment period on the RDEIS, and the FS completely failed to address or acknowledge his scientific concerns.

1  22.8.)[11]  Cluck asserts it is Royce who has incorrectly applied
2  the HSC data by using a self-serving subset of HSC data to
3  develop his own models, which are neither peer-reviewed nor
4  published.  (Id. at ¶s 17, 18.)  Finally, defendants agree with
5  plaintiff that the guidelines are designed to be used one-year
6  postfire and submit that the FS marked the hazard trees less than
7  one year post-fire.  Defendants contend Royce, however,
8  incorrectly used the marking guidelines in his two-year post-fire
9  field visit on July 7, 2009, (Royce Decl., ¶s 2-15, 31-40) and
10  then attempted to extrapolate his flawed data, leading to
11  erroneous conclusions.  (Tompkins Decl., ¶s 14-19; Cluck Decl.,
12  ¶s 7-10.)

13      Based on the evidence submitted by defendants, through the
14  Declarations of Cluck and Ryan Tompkins ("Tompkins") which
15  challenge Royce's conclusions and explain the relevant science
16  relied upon by the agency, plaintiff is not likely to succeed in
17  proving that the FS's decision was unreasonable.  This court must
18  defer to the agency's analysis of scientific data, as such review
19  requires a high level of technical expertise.  Clearly, there is
20  a "battle of experts" on this issue, but "when specialists
21  express conflicting views, an agency must have discretion to rely
22  on the reasonable opinions of its own experts, even if a court
23  may find contrary views more persuasive."  Earth Island I, 351
24  F.3d at 1301.  In McNair, the Ninth Circuit emphasized that a

25  _____

26      [11]    Indeed, the HSC study recognizes that measurement of
    cambium kill is time consuming, may not be logistically possible
27  during rapid field assessments, and that although prone to more
    error than measuring all variables, crown kill or scorch length
28  alone is an acceptable method of assessing mortality.  (Tompkins
    Decl., filed July 31, 2009, Ex. 2 at 280-81.)

22

reviewing court must not itself "act as a panel of scientists that instructs the [FS] how to validate its hypotheses . . . [or] . . . [how to choose] among scientific studies." 537 F.3d at 998. Rather, the proper role of this court is to "simply ensure that the [FS] made 'no clear error in judgment' that would render its action 'arbitrary and capricious.'" Id. at 993. At most, plaintiff has offered a competing view of the underlying science supporting the RHT Guidelines; however, that is insufficient to establish that the FS made an unreasonable decision that was clearly in error. Indeed, the FS amply supports its decision with expert opinion. As such, the court cannot find that plaintiff is likely to succeed in proving that the FS violated NEPA in failing to ensure the scientific accuracy of the RHT Guidelines.

Plaintiff alternatively argues that defendants violated NEPA in failing to properly respond to comments on the guidelines during the RDEIS process. Plaintiff contends that its comments on the RDEIS included detailed commentary from Royce, concluding that the RHT Guidelines are scientifically inaccurate and greatly overestimate mortality of live mature and old-growth trees. Yet, plaintiff contends there was no response to Royce's commentary anywhere in the RFEIS, Vegetation Report or Response to Comments.

Defendants assert that the FS adequately responded to Royce's remarks in the Vegetation Report (Voss Decl., Ex. G at 46-47, 50, 67-68), which in part relied on Tompkins' 2008 declaration (¶s 12-26) filed in the prior litigation (Civ. No. S-08-1957 FCD/EFB), and in the RFEIS (Thrower Decl., Ex. 1 [RFEIS at 63-64, 70, 74-75]). See generally Ex. 1 to Defs.' Supp.

Brief, filed Aug. 12, 2009, at 1 (Docket #50-2).

The court does not find plaintiff's argument availing. Contrary to plaintiff's assertions, the agency did respond. Defendants have demonstrated that the FS considered Royce's views and simply did not agree with his conclusions.  Instead, the FS chose to follow other scientific opinions.  <u>Akiak Native Cmty v. U.S. Postal Service</u>, 213 F.3d 1140, 1146-47 (9th Cir. 2000) (NEPA only requires the FS to consider and respond to comments, not to agree with them).  The FS's decision, after considering Royce's views, to follow scientific opinions contrary to Royce's does not violate NEPA.

Plaintiff also argues the FS failed to respond to scientific opinion indicating a widespread and egregious mismarking of roadside trees.  Dr. Chad Hanson ("Hanson") presented detailed information to the FS at the RDEIS comment stage regarding the marking of large live mature and old-growth trees that had no structural defect and that had green foliage in excess of the mortality guidelines, or that met one of the guidelines' criteria but leaned away from the roadway and thus would not be a hazard to travelers. (Voss Decl., Ex. U [Hanson Supp Roadside Decl. pp. 9-10, ¶ 19 & photos] and Ex. D.)  Plaintiff contends the FS failed to provide any information on the extent of the mismarking after the survey it claims to have conducted. (Hanson Decl., filed July 24, 2009, ¶ 29.)  Plaintiff's experts, Dr. Hanson and Dr. Royce, also visited the Project area on July 7, 2009, and again reviewed the trees marked for cut as roadside hazards.  Dr. Royce concluded that, on average, at least 19 large live trees per mile of roadway do not meet any of the marking guidelines'

criteria for designation as a hazard tree. (Royce Decl., ¶s 2-15, 31-40.)

In response, defendants assert that (1) the FS adequately responded to Hanson's comments during the RDEIS process (see Voss Decl., Ex. E [Vegetation Report at 67-68]; Tompkins Decl., Ex. 4) and (2) through Tompkins' declaration, defendants proffer evidence that the FS did not misapply the RHT Guidelines and followed the direction provided in the PNF LRMP, as amended by the 2004 Framework, in developing and implementing the guidelines (Tompkins Decl., ¶ 23). Defendants further dispute Royce's conclusions, regarding misapplication of the RHT Guidelines, which are based on his July 2009, limited survey of 49 roadside trees marked for removal.[12] Defendants argue the data from Royce's field visit and his analysis based thereon are severely flawed; Tompkins and Cluck attest that there is insufficient information in Royce's declaration to demonstrate that any proper scientific method was used--the sampling itself was neither unbiased nor random because Royce affirmatively chose in advance a proportionately small, apparently continuous portion of road from which to conduct his field visit.[13] (Tompkins Decl., ¶s 14-19; Cluck Decl., ¶ 7-10.) Tompkins and Cluck further maintain

---

[12] As described above, defendants alternatively moved to strike Royce's testimony on this issue on the ground that the study was not submitted to the FS during the EIS process. (See n. 6 supra.)

[13] The hazard tree removal portion of the Project covers 123 miles and 4,389 acres; within this area approximately 57,666 trees were designated for removal out of over 320,400 total trees assessed. (Tompkins Decl., ¶ 20.) Royce's field visit covered a total of 1 mile and reviewed the markings on 49 trees. (Royce Decl., ¶s 7, 31-32.)

that Royce and his associates did not use the proper crown evaluation criteria, and since the findings are based on such a small sample size, Royce's extrapolations, comparisons and estimates are subject to significant potential error.  (Id.)

Defendants contend that contrary to Royce's testimony, there is overwhelming evidence that the FS followed the RHT Guidelines, trees were properly marked and the number of trees that may have been incorrectly assessed as hazards (or non-hazards), is likely very low.  (Tompkins Decl., ¶s 20-23; Cluck Decl., ¶s 11-15.) Cluck performed a Forest Health Protection Evaluation in May 2008 and found that the markings on only approximately a dozen out of an estimated 400 marked trees he surveyed were even questionable. (Cluck Decl., ¶ 11.)  He concluded that "the hazard tree marking guidelines as described in the RFEIS were properly utilized by field crews in making their hazard determinations for individual trees."  (Id. at ¶s 11-15.)

Defendants have demonstrated that they adequately responded to Hanson's comments on the RHT Guidelines during the comment period on the RDEIS.  And, even considering Royce's later findings, developed after the conclusion of the EIS process, defendants have offered compelling evidence challenging the merits of his study.  At most, plaintiff's reliance on Royce's findings creates a "battle of experts."  Such a dispute, however, does not establish a violation of NEPA.  McNair, 537 F.3d at 1000.  The FS is permitted to assess the conflicting experts' views and make a reasoned judgment as to the correctness of one of the experts' opinions.  Id.  Since the FS's conclusions are supported by adequate science after opposing positions were

examined, it is unlikely plaintiff can show that the FS made an unreasoned decision.  Thus, this court cannot find that plaintiff is likely to succeed on the merits of its NEPA claim alleging a failure to respond to dissenting scientific opinion.[14]

As to plaintiff's NFMA claim, plaintiff does not raise a justiciable controversy.  While it is "well established that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of [NFMA]," here, plaintiff has failed to allege how the purported misapplication of the RHT Guidelines violates the PNF LRMP, and thus, NFMA.  Native Ecosystems Council, 418 F.3d at 961.  The guidelines are not an amendment of the PNF LRMP.  Forest Plans are developed and, as necessary, revised under regulations authorized to be promulgated under NFMA by the Secretary of Agriculture.  16 U.S.C. § 1604(g).  The FS's planning regulations are codified at 36 C.F.R. Part 219.  Thereunder, to amend the LRMP the FS must follow the procedures outlined in the transition provisions of the 2000 Planning Rule, as amended, at 36 C.F.R. § 219.35 (2001).  Those transition provisions allow the agency to utilize the plan amendment procedures found in the 1982 Planning Rule, found at 36 C.F.R. §§ 219.10(f), 219.12 (2000).  It is undisputed in this case that the FS utilized none of these plan amendment procedures, nor the procedures for a non-significant plan amendment proscribed in 36

---

[14]   At oral argument, plaintiff raised an additional argument under NEPA, that defendants failed to disclose an error rate permissible under the RHT Guidelines.  However, the FS did disclose in the Vegetation Report that there would be some error associated with marking trees--both in marking trees that should not be marked and not marking trees that should be marked.  (Voss Decl., Ex. G at 68.)

C.F.R. § 219.10(f), when developing the RHT Guidelines for the
Moonlight-Wheeler Project.   Therefore, even if the guidelines
were misapplied, there has been no direct violation of the Forest
Plan nor has plaintiff demonstrated that the alleged
misapplication of the guidelines violated *any* substantive
standard in the PNF LRMP.

Finally, plaintiff's NFMA claim also fails, as a matter of
law, because the guidelines do not have the independent force and
effect of law.   The RHT Guidelines are not binding on the agency
or enforceable by third parties.   The Ninth Circuit addressed
this issue in Western Radio Services Co., Inc. v. Espy, 79 F.3d
896 (9th Cir. 1996), holding that the FS Handbook and Manual were
not binding on the agency, and in River Runners for Wilderness v.
Martin, – F.3d –, 2009 WL 2151356, *5-6 (9th Cir. 2009), holding
that the National Park Service's "2001 Park Service Management
Policies" are intended for guidance only.   In order for a
document to have the independent force and effect of law, it must
"(1) prescribe substantive rules--not interpretive rules, general
statement of policy or rules of agency organization procedure or
practice--and, (2) conform to certain procedural requirements."
Western Radio, 79 F.3d at 901.   The guidelines do neither.
First, the guidelines are not substantive in nature, but were
developed specifically for the Moonlight-Wheeler Project, as
internal guidance providing "parameters for the abatement of road
and facility hazard trees."   (Voss Decl., Ex. D at 1.)   Second,
the guidelines are "not promulgated in accordance with the
procedural requirements of the Administrative Procedure Act," 5
U.S.C. §§ 551-706.   See Western Radio, 79 F.3d at 901.

28

Therefore, for all of these reasons, the court cannot find that plaintiff is likely to succeed on the merits of its NFMA claim with respect to the RHT Guidelines.[15]

### b. Snag Fall-Rates

Plaintiff argues defendants violated NEPA by misrepresenting the science relating to snag fall-rates. Plaintiff contends the RFEIS and Vegetation Report misrepresented several scientific studies regarding the rate at which fire-killed trees fall in order to justify the FS's erroneous assertion that large snags are current roadside "hazards." (Hanson Decl., ¶ 30.) The FS maintains that most snags will fall within about 7 years. (Voss Decl., Ex. G [Veg. Rpt. p. 50]; Ex. A [ROD, p. 6].) Plaintiff argues this assertion is overbroad and, therefore, misrepresents the true facts. Plaintiff argues the studies relied upon by the FS actually show that this snag fall-rate is true only for the smallest trees (less than 10-12 inches generally), which are not considered hazards, and that the majority of the large snags (generally 20 inches and greater) stand for several decades or longer and the length of time they stay standing increases with the girth of the tree. (Hanson Decl., ¶ 30.) Plaintiff contends these misrepresentations have compromised the scientific integrity of the RFEIS as it pertains to the roadside logging,

---

[15]    Moreover, even if the court found that plaintiff had stated a legal violation of NFMA based on the guidelines, that claim would be likely unavailing for similar reasons to plaintiff's NEPA claim challenging the scientific accuracy of the guidelines.  At most, plaintiff has demonstrated a factual dispute over matters within the technical expertise of the FS. Compare Royce Decl. (Docket #15) with Cluck and Tompkins' Decls. (Docket #s 27, 36).  As set forth above, this court cannot resolve such a scientific dispute and must defer to the agency's decision if reasonable based on the underlying evidence.

thereby establishing a NEPA violation.

Defendants respond, in the first instance, that plaintiff's argument is misdirected under NEPA since whether the FS is mismarking trees for removal does not compromise its disclosures with respect to the impacts of the Project.  NEPA does not dictate compliance with any substantive standards for tree removal; it requires only that the FS disclose the environmental consequences of the Project.  Defendants emphasize that the RFEIS fully discloses the impacts from the removal of roughly 18% of the over 320,000 trees above a 10-inch diameter.  (Voss Decl., Ex. G at 50-60.)

Defendants also argue they did not misrepresent the relevant science.  The Dahm (1949) study was accurately reported in the RFEIS and properly relied upon by the FS.  (Tompkins Decl., ¶s 30-44.)  Furthermore, defendants contend they properly concluded that snags in the Project area are expected to have a half-life of 6 to 7 years.  While some studies indicate that the snag fall rate is slower, as cited by Hanson, defendants emphasize that plaintiff fails to acknowledge *other* studies and data discussed in the RFEIS and Vegetation Report that support the FS's conclusion.

For example, the Vegetation Report comes to similar conclusions about the relevant studies that Hanson cites in his declaration, (see Voss, Ex. G at 46-50), but the Report also recognizes that "[t]he Moonlight fire combines many attributes that have been reported to cause a higher and faster rate of snagfall," including fire severity, potential increased beetle infestation, prior history of drought in the area, and the type

30

of soil in the area.  (Voss Decl., Ex. G at 49-50.)   The RFEIS
also discusses the soil type in the Moonlight area and that
effects of precipitation in the presence of such soil conditions
"may cause a higher and faster rate of snag fall, especially in
conjunction with severe weather events."  Id. at 49.  These
conclusions were based not only on findings in other literature
sources on fire-killed snags, but also on observations from past
local fires.  (Voss, Ex. G at 48-49 [noting that "observation . .
. in the Will (1979) and Elephant (1972) fires [found] that fire-
killed stands tended to have higher and faster rates of snagfall"
and "[t]hese local observations are generally consistent with
trends described in the Russell (2006) study"].)

Defendants make a compelling showing that the FS adequately
considered and evaluated the scientific studies and reasonably
determined the snag fall-rates.  Considering that showing, in
conjunction with the other evidence proffered by defendants
demonstrating that the agency adequately disclosed the impacts of
the hazard tree removal on the Project area, the court cannot
find that plaintiff has shown a reasonable likelihood of
succeeding on the merits of this claim under NEPA.

### c.   Black-backed Woodpecker

Plaintiff contends the FS failed to ensure the scientific
accuracy and integrity of its analysis related to the BBWO
because the RFEIS:  (1) misrepresented several scientific studies
in order to justify including moderate-intensity fire areas as
"suitable" BBWO habitat and exaggerate available habitat (Hanson
Decl., ¶ 18); (2) misrepresented studies showing that, after 6
years post-fire, burned forests are at best marginally suitable

31

for BBWO, once again exaggerating available habitat (Hanson

Decl., ¶ 19); (3) misrepresented studies in order to support the

erroneous assertion that BBWO distribution is "stable" (Hanson

Decl., ¶ 20); and (4) used figures the FS admits are erroneous to

estimate the amount of suitable BBWO habitat currently available

in the Sierra Nevada (Hanson Decl., ¶ 21).   Plaintiff argues that

by asserting that certain scientific studies support their

definition of suitable BBWO habitat, when the studies in fact

support the opposite conclusion, the FS violated NEPA.   Sierra

Club v. Eubanks, 335 F. Supp. 1070, 1078-1079 (E.D. Cal. 2004)

(holding that the FS violated NEPA by misrepresenting the

conclusions of scientific studies cited in the environmental

analysis documents--specifically, by claiming that the studies

recommended removal of large trees when they made no such

recommendation); see also Earth Island Inst. v. Morse, No. 08-

1897 JAM/JFM, 2009 WL 2423478, *6-8 (E.D. Cal. Aug. 5, 2009)

(finding a violation of NEPA's requirement to ensure the

scientific accuracy and integrity of its analysis based on the

FS's mis-characterization of a scientific study which the agency

then used to support its decision on the impacts of a proposed

logging project).

Defendants emphasize, to the contrary, that the FS

considered Hanson's study and provided an extensive discussion

why it found the standards employed to describe burn severity and

the methodology to detect BBWO to be problematic. (Voss, Ex. E at

D-33-37; Yasuda Decl., filed July 31, 2009).

Furthermore, defendants argue the FS's use of moderate-intensity

burn areas to estimate suitable BBWO habitat is supported by

scientific evidence that shows that "moderate and low burn severity areas *also* provide habitat for BBWOs." (Voss, Ex. E at D-35; see generally Yasuda Decl.) (emphasis added).

As to plaintiff's specific claim that the FS violated NEPA by misrepresenting the status of the BBWO population, and failing to ensure the Project would not threaten BBWO viability, defendants proffer evidence that the FS adequately considered and evaluated studies on BBWO trends, (Thrower Decl., Ex. 1 at 50-51; Voss Decl., Ex. E at D-38), and determined the Moonlight and Wheeler fires created 32,569 acres of suitable BBWO habitat in the Project Area. (Thrower Decl., Ex. 1 at 46-47.) The RFEIS references a MIS trend report, summarized the suitable habitat and distribution population trends from the report, and concluded that the data indicate that BBWO "continue to be distributed across the Sierra Nevada" and that "distributions of BBWO populations in the Sierra Nevada is stable." (Thrower Decl., Ex. 1 at 50-51.) Furthermore, the FS determined that the Project implementation would still leave 20,172 acres of newly available BBWO habitat compared to pre-fire (2002) conditions, (Thrower Decl., Ex. 1 at 46-47), which would result in a short term population increase compared to pre-fire conditions, and, not threaten viability. (Id. at 49, 52.)

Finally, as to plaintiff's claim that the FS used figures to estimate suitable BBWO habitat that it "admits are erroneous," defendants argue plaintiff is wrong. The RFEIS discloses how the BBWO habitat estimate was determined, and the FS stated that certain figures represent a "ballpark . . . of how much potential habitat is available" rather than a precise habitat acreage

33

1   figure.  (Thrower Decl., Ex. 1 at 130; Voss Decl., Ex. E at

2   D-39-40.)

3       Considering the evidence proffered by defendants, it is

4   unlikely that plaintiff will be able to show that defendants'

5   conclusions regarding suitable habitat and viability of the BBWO

6   were clearly in error.  Plaintiff has not persuasively

7   demonstrated a misrepresentation of the underlying science.  In

8   that key respect, this case is distinguishable from _Morse_, a

9   recent decision of this court which plaintiff relies upon.  2009

10  WL 2423478 at *6-8.  In _Morse_, after consideration of the

11  parties' cross-motions for _summary judgment_, Judge Mendez found

12  that the FS had misrepresented a scientific study in its

13  Environmental Assessment on the logging project.  Specifically,

14  the court found the FS used an _erroneous_ maximum stand density

15  index value to support the intensity of tree removal it proposed.

16  _Id._  No such an obvious error by the agency has been shown by

17  plaintiff in this case.

18      Based on the evidence before the agency here, the FS

19  reasonably considered areas where BBWO have been detected and

20  conditions that they have been observed to use as a framework for

21  describing suitable habitat, and the FS also reasonably concluded

22  that populations would increase above previous levels such that

23  the viability of the woodpecker would not be threatened.  Like

24  elsewhere, while plaintiff proffers Hanson's testimony to refute

25  the science relied upon the FS, such contrary scientific opinion

26  does not establish a violation of NEPA.  As noted previously,

27  this court is not permitted to sit as a "super"-scientist,

28  adjudging the correctness of the agency's decision.  _McNair_, 537

34

F.3d at 993, 998 (emphasizing that the court is not permitted to make "fine-grained judgments of the [the science's] worth").  To prevail, plaintiff must demonstrate the agency made a *clear error of judgment* (Id. at 993); considering defendants' rebuttal evidence above, plaintiff has made no such showing.

Closely related to its argument that the FS failed to ensure the scientific accuracy and integrity of its analysis on the Project's effects on BBWO, plaintiff argues, more specifically, that the FS violated NEPA by failing to divulge the methodology it used to assess the amount of BBWO habitat necessary to maintain the viability of the species.  Plaintiff contends the RFEIS failed to divulge the methodology used to determine that the current and post-logging amount of suitable BBWO habitat would be sufficient to ensure viable populations of BBWO in the PNF and the Sierra Nevada (Hanson Decl., ¶s 21-23).  This failure, plaintiff contends, is a fundamental flaw in the analysis of impacts to the BBWO and thus rendered the FS's finding regarding threatened viability meaningless.

Defendants respond that the FS did, in fact, disclose the methodology used to estimate fire intensity (and thus BBWO habitat levels) in the RFEIS and the Vegetation, Fuels, Fire, and Air Quality Report, both of which provide the methods of assessing post-fire conditions, including "field observations, stand exams, and remote sensing."  (Thrower, Ex. 1 at 54; Voss, Ex. G at 3-9.)

While plaintiff's expert Hanson attacks the adequacy of the disclosure of the FS's methodology, the above evidence proffered by defendants shows that the FS disclosed the methods underlying

its analysis.  Again, this court is not permitted to second-guess the science relied upon by the agency; here, the FS's decision on suitable habitat was based on scientific findings and methodologies employed to make those findings.  As such, plaintiff cannot establish a likelihood of success in showing a violation of NEPA on this alternative basis.

Plaintiff also alleges a NEPA violation based on the FS's purported failure to consider dissenting scientific opinion regarding the Project's effects on BBWO.  During the comment phase of the RDEIS, plaintiff states Hanson submitted detailed comments noting: (1) that the RDEIS failed to divulge the methodology used to estimate fire intensity (and therefore BBWO habitat); (2) that the RDEIS mischaracterized cited sources for its assertion that BBWO distribution is "stable;" (3) that the RDEIS mischaracterized, and grossly inflated, existing BBWO suitable habitat in the Sierra Nevada; (4) that there are only about 23,000 acres of truly suitable BBWO habitat currently existing in the Sierra Nevada, 17,776 of which are in the Moonlight-Wheeler fire area and about half of which would be removed by logging; (5) that the existing suitable habitat amount is already insufficient; and (6) that the Project would result in critically-low BBWO population levels, threatening the viability of the species in the Sierra Nevada (and potentially numerous other species for which the BBWO is an indicator).  (Voss Decl., Ex. I [Hanson RDEIS Comments].)

Plaintiff argues the RFEIS utterly failed to meaningfully respond to this dissenting scientific opinion because it: (1) cited to non-existent data to define the method used to estimate

fire intensity (Hanson Decl. ¶ 17); (2) failed to respond to Hanson's comment that the RDEIS mischaracterized the sources used to support the claim of "stable" BBWO distribution (Hanson Decl., ¶ 20); (3) acknowledged that the amount of existing BBWO suitable habitat in the Sierra Nevada was mischaracterized and inaccurately inflated, but failed to delete the erroneous figures and failed to provide a corrected estimate of the current amount of suitable BBWO habitat in the Sierra Nevada (Hanson Decl. ¶s 21-22); and finally, (4) failed to explain why the Moonlight-Wheeler Project would not threaten the viability of the BBWO in the Sierra Nevada (Hanson Decl. ¶ 23).

As set forth above, defendants assert the FS considered Hanson's study and provided an extensive discussion why it found the standards employed to describe burn severity and the methodology to detect BBWO to be problematic. (Voss, Ex. E at D-33-37; Yasuda Decl., filed July 31, 2009).  Moreover, the FS specifically addressed each of Hanson's contentions, described above, in the RDEIS process, and its rejection of Hanson's views is further explained in the RFEIS.  See Ex. 1 to Defs.' Supp. Brief (Docket #50-2) (Thrower Decl., Ex. 1 [RFEIS at 53, 82] and Voss Decl., Ex. G [Veg. Rep. at 3, 13-21] and MIS Report at 11, Table 13 [disclosing methodology used to estimate fire intensity]; Voss Decl., Ex. E [Resp. to Comments at D-38] [responding to comments that FS mischaracterized cited sources on stability of the BBWO population]; Voss Decl., Ex. E [Resp. to Comments at D-44-45] [responding to comments that FS mischaracterized existing BBWO suitable habitat]; Voss Decl., Ex. E [Resp. to Comments at D-44-45] [responding to comments re:

1  amount of suitable acerage]; Voss Decl., Ex. E [Resp. to Comments

2  at D-44-45] [responding to comments re: sufficiency of existing

3  suitable habitat].)

4      Based on the evidence proffered by defendants, plaintiff

5  will be unlikely to show that the FS failed to consider Hanson's

6  contrary views.  Indeed, the FS responded in the comment period

7  to Hanson's opinions, explaining why the FS agreed or disagreed

8  with his conclusions, and how it used the scientific studies in

9  determining suitable habitat for woodpeckers.  NEPA only requires

10 the FS to consider and respond to comments, not to agree with

11 them.  Akiak Native Cmty v. U.S. Postal Service, 213 F.3d 1140,

12 1146-47 (9th Cir. 2000).  The court finds that plaintiff is

13 likewise unlikely to succeed on the merits of this NEPA claim.

14     Finally, with respect to the BBWO viability, plaintiff

15 further contends defendants violated NFMA in failing to monitor

16 for and ensure the viability of the BBWO.  Plaintiff argues that

17 pursuant to the 1982 NFMA regulations, defendants were required

18 to monitor the BBWO population since the BBWO is a designated

19 MIS.  See 36 C.F.R. §§ 219.19(a)(1), 219.19(a)(6).  Plaintiff

20 contends that to comply with the regulations and find that the

21 viability of a particular MIS is being ensured, the FS is

22 required to monitor the species or, under Ninth Circuit case law,

23 may in some instances use an assessment of habitat as a proxy for

24 actual monitoring.  McNair, 537 F.3d at 996.  Plaintiff asserts

25 that the FS has not performed monitoring surveys for the BBWO, at

26 either the region, forest or project level.  Rather, in an effort

27 to meet those obligations under NFMA, the FS decided to utilize

28 BBWO habitat as a proxy for the health of the species.  Plaintiff

contends, however, the FS failed to provide the information
necessary to support its assertion that removal of habitat in the
Moonlight-Wheeler fire area would not threaten the viability of
the BBWO.

Specifically, plaintiff alleges there are two reasons why
the FS's viability determination for the BBWO is arbitrary and
capricious: (1) As discussed above, the FS's method for measuring
the existing amount of BBWO habitat was not "reasonably reliable
or accurate," and resulted in an overstatement of suitable
habitat in the Project area and throughout its range (Hanson
Decl. ¶s 17-19) and (2) plaintiff contends the Project documents
never actually identify "the quality and quantity of habitat that
is necessary to sustain the viability of the species in
question." McNair, 537 F.3d at 998; Or. Natural Resources
Council Fund v. Goodman, 505 F.3d 884 (9th Cir. 2007).  While
estimates are provided as to how much habitat currently exists in
the Project area and how much will be removed (Voss Decl., Ex. B
[RFEIS p. 128]), the Project documents never divulge how many
birds, and how much suitable habitat, is necessary to ensure a
viable population of BBWO in the PNF or the Sierra Nevada.
Plaintiff contends that without such critical information,
namely, an accurate assessment of the amount of suitable habitat
available, and the number of woodpeckers/amount of habitat needed
to maintain a viable population, it is impossible and
impermissible to use habitat as a proxy.  See Id.

Defendants respond that population monitoring
at the project level is not required, and thus, the FS is not
using a habitat proxy method to determine the effects of Project

implementation on the BBWO.  Second, for the reasons more fully
described above, the FS argues it adequately disclosed the
impacts of the proposed Project on BBWO suitable habitat, and
determined that Project implementation would not change the
distribution of BBWO across the Sierra Nevada bioregion.
Defendants acknowledge that NFMA requires the FS to develop a
forest plan, and all subsequent site-specific plans must comply
with the underlying forest plan. 16 U.S.C. § 1604.  However,
defendants emphasize that in 2007, the MIS Amendment amended the
MIS list and associated monitoring requirements for ten National
Forests in the Sierra Nevada, including the PNF. (Thrower Ex. 11
at 1).  Although the 2007 MIS Amendment calls for distribution
population and habitat monitoring for the BBWO at the bioregional
scale, id. at 2, 3, 11, the Amendment requires only the
"assessment of habitat for MIS" at the project-level.  Id. at 11
("There are no MIS monitoring requirements in the project area or
at the project level.")

    Defendants assert an "assessment of [BBWO] habitat" is
exactly what the FS did in this case in compliance
with the 2007 MIS Amendment and NFMA.  Contrary to plaintiff's
assertion, the FS has conducted and will continue to conduct
bioregional monitoring of BBWO in compliance with the 2007 MIS
Amendment. (See Thrower Ex. 4.)  The BBWO surveys were funded by
the FS and conducted by The Institute for Bird Populations'
Sierra Nevada Bird Observatory.  (Id. at 20.)

    Defendants describe that at the project level, the FS
determined that prefire conditions in the analysis area were able
to support between 2 and 39 pairs of BBWOs, while post-fire

40

conditions created 32,659 acres of new suitable habitat

"theoretically able to support an additional 65 to 1,020 pairs"

and thus "creat[ing] an upward trend in BBWO habitat from

existing conditions." (Thrower Ex. 1 at 131.)  The FS analyzed

the amount of suitable habitat that would be lost in the analysis

area due to salvage logging, and concluded that 62% of suitable

habitat created by the Moonlight and Wheeler fires, or 20,172

acres, would remain untreated, and thus still support an upward

trend in BBWO population.  (Id. at 128, 131; see also Thrower

Decl., Ex. 5 at 57-58.)  Finally, the FS also analyzed the

relationship of the project-level habitat impacts to the

bioregional BBWO population trends and determined that after

Project implementation, there would still be sufficient acres of

forested areas that burned at high severity to support BBWO

suitable habitat.  (Thrower Ex. 1 at 129-130.)

    Plaintiff is unlikely to succeed on the merits of its NFMA

claim, as a matter of law.  Plaintiff's reliance on McNair and

Goodman is unavailing as in those cases, the forest plans

required the FS to monitor populations.  See McNair, 537

F.3d at 989; Goodman, 505 F.3d at 890.  Here, under the 2007 MIS

Amendment, there is no requirement to monitor population levels

of MIS at the project level, only an obligation to "assess

habitat." (See Thrower Ex. 11 at 11.)  In McNair and Goodman,

the FS was relying on a habitat proxy approach in order to

determine the impact of the projects on the species' populations.

See McNair, 537 F.3d at 994-997; Goodman, 505 F.3d at 890.  In

the present case, the FS is doing only an "assessment of

habitat," as required by the 2007 MIS Amendment, and is not

41

claiming that a specific amount of habitat will support a
specific number of birds.  Finally, plaintiff's reading of <u>McNair</u>
is overly broad.  There, the Ninth Circuit recognized  that
"[g]ranting the Forest Service the latitude to decide how best to
demonstrate that its plans will provide for wildlife viability
comports with our reluctance to require an agency to show us, by
any particular means, that it has met the requirements of NFMA
every time it proposes action.  We have  have approved of forest
plans when they are 'based on the current state of scientific
knowledge.'"  <u>McNair</u>, 537 F.3d at 992.

    For the reasons described above, this court cannot find that
plaintiff has shown that the FS failed to meet this obligation,
in this case, with respect to the BBWO, and thus, the court
cannot find that plaintiff is likely to succeed on the merits of
this NFMA claim.

### d.   California Spotted Owl

    Plaintiff further contends the FS failed to ensure the
scientific accuracy and integrity of its assessment of impacts to
the CSO from the Project because the RFEIS misrepresents data and
ignores studies showing that spotted owls benefit from, and
preferentially forage within, moderate- and high-intensity fire
areas, in order to justify claims that the owls will not be
harmed by planned logging of this habitat.  (Bond Decl., filed
July 24, 2009, ¶s 1-12, 18-19).  Specifically, plaintiff contends
the FS refused to acknowledge new scientific findings and stated,
"the Forest Service does not consider moderately-high and high
severity burned forests as providing suitable habitat conditions
for the spotted owl."  (Voss Decl., Ex. E [Response to Comments,

42

p. D-47].  The FS also refused to accept the new scientific
information showing that owls are seriously harmed by post-fire
logging (id.), stating that "[f]ire-killed tree removal would not
result in any additional unsuitable spotted owl habitat above
what was changed due to wildfire." (Voss Decl. Ex. F [RFEIS at
119].)

     Plaintiff argues that due to this flagrant disregard of the
current science regarding the CSO, fire and salvage logging,
there exists no rational basis for the FS's conclusions regarding
the impacts (or lack thereof) that this Project will have on the
owl, thereby establishing a violation of NEPA.

     Defendants respond that the FS used a widely-accepted
definition of suitable owl habitat based on Verner, et al 1992.
(Thrower, Ex. 1 at 91-91; Voss Decl., Ex. V [Biological
Evaluation ("BE"), at 45]; Collins Decl., filed July 31, 2009,
¶ 8.20.)  Defendants assert that contrary to plaintiff's
contentions, both the RFEIS and BE considered Bond's assertion
that owls may use severely burned areas and recognized that owls
can use burned forests. (Voss Decl., Ex. V at 45; Thrower, Ex. 1
at 91-92; Collins Decl., ¶ 9; Yasuda Decl., ¶ 31.)  In response
to comments as well as in the RFEIS and the BE, the FS explained
that while burnt forests may create some short term burned
"suitable" habitat, as defined by Bond (2007) and others, such
use would be at best temporary as high severity fires create
unsuitable owl habitat over the long term.  (Id.)

     Additionally, defendants argue that plaintiff incorrectly
asserts that the FS failed to analyze impacts of post-fire
salvage logging on the spotted owl.  Defendants contend this

issue was addressed in detail in the FS's Response to Comments on the RDEIS (Voss Ex. E at D-52-D-53) and through defendant's expert Chris Collins ("Collins") (Collins Decl., ¶ 16.21). Defendants maintain that because suitable owl habitat will not be present within the fire area for another 80 to 100 years, it is "highly implausible" that the fire-killed trees will remain standing that far into the future to provide nest sites for owls. (Voss Decl., Ex. V at 45-49, 69-70; Collins Decl., ¶ 15.) Finally, contrary to Bond's arguments, in recognition of recent studies that show severely burned forests being utilized by owls, the RFEIS and BE clearly disclose that adverse effects to owls could potentially occur due to disturbance and loss of foraging habitat as a result of removal of fire-killed or roadside hazard trees. (Thrower, Ex. 1 at 118; Voss Decl., Ex. V at 62; Collins Decl., ¶ 15.) However, the RFEIS and BE conclude that while the removal of some trees may create an incremental decrease in the available prey base in the short term, the overall impact on the owl from the Project is expected to be negligible, especially with the imposition of mitigation measures, such as prohibiting operations within occupied owl Protected Activity Centers ("PACs") between March 1 and August 1. (Thrower, Ex. 1 at 119; Voss Decl., Ex. V at 62.)[15]

---

[15]   Defendants also point out that plaintiff's arguments generally ignore the fact that under the proposed alternative, and considering the cumulative effects of all projects in the analysis area, approximately 73 percent of the fire land base located on public land would not be treated for fire-killed or hazard removal (Thrower Decl., Ex. 1 at 119), thus leaving a substantial portion of burned forest for owl foraging.

Considering the evidence proffered by defendants, plaintiff has not shown a likelihood of demonstrating that the FS misrepresented the science for owls or failed to respond to the opposing science, and thus, plaintiff is unlikely to sustain a NEPA violation.  The FS reasonably relied on pertinent studies and its own experts' analysis.  At most, plaintiff's arguments amount to a presentation of a different expert opinion, but it is not the role of this court to determine which opinion it prefers. McNair, 537 F.3d at 1000 (again, recognizing that a reviewing court is not to entertain a "battle of the experts" when plaintiffs proffer expert testimony to set against the agency's professional judgment).

Plaintiff alternatively contends that the FS violated NEPA in failing to respond to dissenting scientific opinion regarding the benefits of fire for the CSO.  Plaintiff states that its expert, Monica Bond ("Bond"), submitted detailed comments on the RDEIS: (1) concluding that the new scientific evidence, including Bond's own new study (the Abstract of which she submitted with her comments), shows that spotted owls preferentially forage within moderate- and high-intensity fire areas because such areas have enhanced levels of the owls' small mammal prey; (2) finding that moderate- and high-intensity areas are suitable foraging habitat for spotted owls; and (3) concluding that new scientific evidence shows that post-fire logging harms spotted owls, and owls actively avoid areas subjected to post-fire logging (which removes snags for owls to perch on and the habitat used by the owls' small mammal prey).  (Voss Decl., Ex. J [Bond RDEIS Comments].)  According to plaintiff, the RFEIS failed to

meaningfully respond to these important new scientific
discoveries, and instead: (1) relied upon 17-year-old
inapplicable data from unburned forests to assert that moderate-
and high-intensity patches cannot provide suitable habitat for
Spotted owls (Bond Decl., ¶s 1-12); and (2) refused to
acknowledge data presented by Bond on the harmful effects of
post-fire logging on spotted owl occupancy and foraging, choosing
instead to assert that fire renders owl habitat unsuitable and
post-fire logging causes no additional harm beyond that
supposedly caused by the fire (Bond Decl., ¶s 12-19).

Defendants contend, to the contrary, that the FS responded
to Bond's comments during the RDEIS process and in the RFEIS.
(See Ex. 1 to Defs.' Supp. Brief [Thrower Decl., Ex. 1 at RFEIS
at 91, 188 and Thrower Decl., Ex. 10 at BE/BA at 47-48 and Voss
Decl., Ex. E at D-47-49 (responding to comments re: assertion
that CSO selectively forage within moderate- and high-intensity
fire areas); id. (responding to comments that moderate- and high-
intensity areas are suitable foraging habitat for CSO; Voss
Decl., Ex. E at D-49 (responding to comments that scientific
evidence shows that post-fire logging harms CSO and CSO avoids
such areas)].)  Additionally, defendants note that their ability
to evaluate Bond's alleged "new" scientific research was limited.
Only Bond's abstract from a yet, to date, unpublished paper was
available during the commend period.  Therefore, defendants argue
that some of Bond's opinions were not of significant import,
considering their preliminary and unpublished status.  Finally,
defendants emphasize, for the reasons set forth above, that the
RFEIS's findings with respect to the Project's impacts on the CSO

46

are scientifically accurate, and the FS reached reasonable conclusions based on available expert opinion and reliable scientific sources.

Defendants have persuasively demonstrated that the FS responded to all relevant opposing views with respect to the Project's effects on the CSO.  Bond's opinions, that were fully before the agency, were expressly considered by the FS.  While her opinions were ultimately rejected by the FS based on other experts' opinions and other science, such is the agency's prerogative, so long as its decision is reasonable.  For the reasons set forth above, this court cannot find that plaintiff has shown that the FS's decision was unreasonable.  Defendants have made a compelling showing that the FS (1) adequately considered Bond's claims; (2) adequately disclosed the impacts on owls; and (3) reasonably determined that the Project would not adversely affect owl viability.  Therefore, the court finds that plaintiff has not shown a likelihood of success on this alternative claim under NEPA.

### e.   Impacts of Logging on Post-Fire Soils and Watersheds

Plaintiff makes two contentions with respect to the FS's consideration of the impacts of the logging on post-fire soils and watersheds.  First, plaintiff contends the FS violated NEPA by failing to respond to comments and data regarding the extent of the impacts of the Project on post-fire soils.  Second, plaintiff claims the FS violated NFMA because it failed to protect soils and watersheds from irreversible damage.

47

With respect to the first contention under NEPA, plaintiff asserts that Jon Rhodes, an expert forest hydrologist, submitted detailed data and photographs to the FS during the RDEIS comment period, based upon his 2008 site visit to the Project area.  His site data of actual logging within the Wheeler fire area revealed that post-fire logging reduced existing ground cover by about 50%, and almost completely eliminated live vegetation ground cover.  (Voss Decl., Ex. H [Rhodes RDEIS Comments, p. 8, Fig. 1].)  Yet, plaintiff contends the RFEIS failed to respond to Rhodes' data, and inexplicably asserted, without citation to any data source, that planned logging would only reduce ground cover by 15-30%.  (Rhodes Decl., ¶s 74-78 and Photos 1-9.)

Plaintiff further asserts Rhodes submitted detailed comments during the RDEIS stage pointing out that the FS failed to analyze several key factors related to soils, watershed, and stream impacts, including: (a) the location and amount of roads that would be subject to reconstruction, maintenance, and/or elevated use, and the estimated amount of erosion and sedimentation that would result; (b) the location and amount of landings (for skyline and tractor units) that would be constructed/ reconstructed, and the estimated amount of erosion and sedimentation that would result; (c) a quantitative estimation of elevated erosion and sedimentation from "temporary" road construction; (d) the amount of large woody debris of which streams and aquatic habitat and species would be deprived due to logging within Riparian Habitat Conservation Areas; (e) an estimate of the increase in stream temperatures due to decreased shading as a result of logging; and (f) the adverse impacts on

aquatic habitat and wildlife resulting from the foregoing.
Plaintiff argues the RFEIS simply failed to provide this
analysis, calling into question the validity of its impacts
assessment to soils and streams.

Contrary to these assertions, defendants argue the FS
provided extensive responses to each of Rhodes' comments
described above in the FS's "Responses to Comments" during the
RDEIS process (Voss Decl., Ex. E at D-61-69) or in the RFEIS
(Thrower Decl., Ex. 1).[16]  Defendants contend the FS also
adequately disclosed the impacts of the Project to soils and
watersheds.  For example, the Soils and Hydrology Report
discloses the design features the Project will use in order to

---

[16]  See Ex. 1 to Defs.' Supp. Brief (Docket #50-2)
(describing for example how the FS responded to Rhodes' data with
respect to the impact of logging on existing ground cover in the
RFEIS at 11-12, 195-96, 208, 210 [Thrower Decl., Ex. 1]).  The FS
also responded to Rhodes' arguments with respect to specific
alleged soil, watershed, and stream impacts.  Id. at Thrower
Decl., Ex. 1 (RFEIS at 194, 206-223) and Voss Decl., Ex. E at D-68
(regarding impact of location and amount of roads that would be
subject to reconstruction, maintenance and/or elevated use and
the estimated amount of erosion and sedimentation that would
result); Thrower Decl., Ex. 1 (RFEIS at 16 (Table 4), 195-96,
206-07 (regarding impact of location and amount of landings for
skyline and tractor units that would be
constructed/reconstructed, and the estimated amount of erosion
and sedimentation that would result); Thrower Decl., Ex. 1 (RFEIS
at 210, 216 (regarding analysis of quantitative estimation of
elevated erosion and sedimentation from temporary road
construction); Thrower Decl., Ex. 1 (RFEIS at 132, 206, Appx. F)
and Voss Decl., Ex. E at D-66 (regarding analysis of estimate of
increase in stream temperatures due to decreased shading as a
result of logging); Thrower Decl., Ex. 1 (RFEIS at 103, 109, 130-
31, 204-06, 210-14) and Thrower Decl., Ex. 10 (BE/BA at 27) and
Voss Decl., Ex. E at D-26 (regarding analysis of amount of large
woody debris of which streams and aquatic habitat and species
would be deprived due to logging within RHCA areas); Thrower
Decl., Ex. 1 (prior cites re: woody debris) and (RFEIS at 109-
111, 131-33), Ex. 10 (BE/BA at 25, 35-37) (regarding analysis of
adverse impacts on aquatic habitat and wildlife resulting from
the foregoing).

minimize ground disturbance, such as restricting ground-based
equipment to slopes less than 35 percent, using lop and scatter
methods, and following equipment restrictions in riparian areas.
(Thrower Decl., Ex. 5 at 3.)   The Report also discusses and
discloses the environmental impacts of each alternative.  (Id. at
14-35.)   For instance, the Report describes that rates of
erosion, already above natural erosion rates due to the wildfire,
will not be impacted by Project implementation; however, the FS
acknowledges that natural recovery will be prolonged from two to
five years.  (Id. at 15.)   Similarly, the Report discusses the
effects of surface flow and water quality; describes that
temporary roads will be closed within the same year of harvest to
minimize their impacts to hydrologic function of the soils; and
concludes that the overall effect of the temporary roads is
"expected to be similar to the long-term pre-fire condition."
(Id. at 21-22.)   Finally, the Report discusses how the
probability of impairment to water quality in the near term is
largely due to the existing burned condition, (id. at 22), and
that "[g]iven implementation of erosion control features . . .
impacts to water quality from activity disturbed ground are not
expected to be a significant factor" (id. at 24).

Ultimately, under NEPA, agencies must take a "hard look at
the issues and respond[] to reasonable opposing viewpoints."
Earth Island I, 351 F.3d at 1301.   Here, the FS submits evidence
persuasively demonstrating that it responded to Rhodes' comments
during the RDEIS process and in the RFEIS itself, thus meeting
the agency's NEPA obligations.  (See n. 16 supra)   NEPA only
requires the FS to consider and respond to comments; the FS is

not obligated to accept opposing views. <u>Akiak Native Cmty</u>, 213
F.3d at 1146-47.  Moreover, because analysis of scientific data
requires a high level of technical expertise, this court must
again defer to the informed discretion of the agency.  <u>McNair</u>,
537 F.3d at 993, 1000.  Here, through the Soils and Hydrology
Report, the FS adequately disclosed the environmental impacts of
the Project's actions on the soils and watersheds; plaintiff has
simply not shown that the FS's conclusions therein were
unreasonable considering the underlying evidence before the
agency.  As such, the court cannot find that plaintiff is likely
to succeed on the merits of this NEPA claim.

        For similar reasons, the court cannot find that plaintiff is
likely to succeed on its second contention under NFMA.  NFMA
requires that the agency "insure that timber will be harvested .
. . only where soil, slope, or other watershed conditions will
not be irreversibly damaged."  16 U.S.C. § 1604(g)(3)(E).
Plaintiff contends that here, the FS cannot ensure the long-term
protection of soil and watershed resources because its logging is
likely to irreversibly damage the area's soils and watersheds.
More specifically, plaintiff contends in the RFEIS, the FS has
not met its burden to show it is protecting soils from
irreversible damage.  Plaintiff points out that the FS admits
that its logging, biomass removal, landing, and road construction
in both ground-based tractor and sky-line units will more than
double the natural erosion rates if implemented two years
post-fire.  (Voss Decl. Ex. F [RFEIS at 209].)  Plaintiff further
contends that because the loss of soil is irreplaceable in human
timescales, (<u>see</u> Voss Decl., Ex. P (Beschta et al. (1995), p. 7);

51

Rhodes Decl., ¶s 79-82), activities that cause significant soil erosion violate NFMA. Moreover, plaintiff emphasizes that while the FS states that "natural recovery would be set back from 2 to 3 years from an erosion standpoint," it acknowledges that "[l]onger term effects are more difficult to discern with poor understanding of long term effects." (Voss Decl., Ex. F (RFEIS at 219)). Based on this concession, plaintiff argues that if the FS cannot discern or understand the long-term effects on soils, then it cannot ensure the protection of soil resources or ensure that they are not irreversibly damaged.

Additionally, plaintiff uses a specific example to support its contentions: The PNF LRMP implemented a standard that, if an area's Erosion Hazard Rating ("EHR") is "very high" (11-13), then the FS must "severely limit soil disturbing activities." (Voss Decl., Ex. Q [PNF Plan at 4-44].) However, plaintiff asserts that instead of following that directive, the Project permits logging on 1,971 acres with "high" or "very high" EHRs in Riparian Habitat Conservation Areas. (Voss Decl., Ex. F [RFEIS, p. 210, Table 103].) Plaintiff contends this inconsistency with the Plan is a violation of NFMA. 16 U.S.C. § 1604(i).

Finally, plaintiff asserts that most watersheds (19 of 26) in the fire areas have very high or extreme "thresholds of concern" for cumulative watershed effects ("CWEs"), caused by recent private land salvage logging, wildfire effects, and past management on national forest lands. (Voss Decl., Ex F [RFEIS, p. 197].) In the Moonlight-Wheeler area, based on the condition of these watersheds, plaintiff contends salvage logging is legally incompatible with watershed protection. At the very

least, plaintiff argues the FS cannot "insure" that watersheds
will be protected or not irreversibly damaged, and thus, it has
failed to meet the requirements of NFMA.

Defendants respond that plaintiff's argument ignores the
RFEIS which expressly identifies design features that will be
used to prevent irreversible damage to soils. (Thrower Decl.,
Ex. 1 at 11-14, 195-96, Appx. C at C-3 to C-6).)   Importantly,
neither NFMA nor the PNF LRMP *preclude* harvest in EHR areas.
Rather, the PNF LRMP standards direct that adequate ground cover
for disturbed sites is to be determined for each project on a
case-by-case basis.   Moreover, defendants contend the Project
implements features that will protect areas with high or very
high EHRs from becoming irreversibly impaired.   For example, the
Project proposes to utilize project materials, "such as scattered
top and limb slash material, to improve existing ground cover
where possible until basal vegetation can be re-established."
(Thrower Decl., Ex. 1 at 204.)   Although erosion is predicted to
increase over the short-term with tractor or skyline salvage
methods, modeling illustrates that erosion potential would return
to normal within five years.   (Id. at 16-17.)   Furthermore,
according to the FS, the Project will use Best Management
Practices ("BMP") to lower incidence of surface erosion and
sediment delivery, which BMPs have been validated by over 600
evaluations of BMP effectiveness on the PNF. (Thrower Decl., Ex.
5 at 18.)   With respect to water quality, the Soils and Hydrology
Report finds that with the implementation of BMP, the impacts to
water quality will not be significant. (Id. at 24.)

Considering defendants' showing particularly in light of the legal requirements set forth above, plaintiff has not made a compelling case that the Project will irreversibly damage soils and watersheds.  Defendants have explained the mitigation measures that will be taken to prevent such damage, and those measures are supported by reasonable scientific opinion. Plaintiff has not shown that defendants' conclusions regarding the Project's impacts on the soils and watersheds were clearly in error.  Therefore, the court cannot find a likelihood of success with respect to plaintiff's NFMA claim.

### f.   Monitoring of SAR

Plaintiff argues defendants violated NFMA in failing to conduct required population monitoring for SAR prior to approving habitat removal activities.  Plaintiff contends that contrary to defendants' position, stated in its response to plaintiff's comments on the RDEIS, annual population monitoring is required for SAR pursuant to the 2004 Framework, which incorporated the requirements of Appendix E from the 2001 Framework.  In support of its position, plaintiff relies on Earth Island II, 442 F.3d at 1176 and the decisions of this court in Sierra Club v. Eubanks, 335 F. Supp. 2d 1070, 1082 (E.D. Cal. 2004) and  Sierra Nevada Forest Protection Campaign v. Tippin, 2006 WL 2583036, *17 (E.D. Cal. Sept. 6, 2007) which held that population monitoring was required for certain *MIS* in Appendix E.  Plaintiff contends these cases, though addressing MIS and not SAR, are nonetheless equally applicable to SAR since the same rules for population monitoring in Appendix E of the 2004 Framework apply to both MIS and SAR. Plaintiff argues the 2007 MIS Amendment is inconsistent with the

54

applicable NFMA regulations and should not be interpreted as overriding the Frameworks' requirements.

In this case, plaintiff states that the Olive-sided Flycatcher, Sierra Nevada Snowshoe Hare, Silver-haired Bat, and Long-legged Myotis, present in the Project area, are among several SAR species listed on Appendix E as requiring annual population distribution monitoring (Voss Decl., Ex. M [Appx. E, Table E-9]).  Plaintiff contends these four SAR species were identified as at risk due to serious concerns about their population viability; plus, these species depend upon post-fire habitat features that would be greatly reduced or eliminated by the Project, including large snags and patches of montane chaparral.  (Hanson Decl., ¶s 25-28.)  Plaintiff argues there is very little information regarding these species in the Project documents, and no monitoring data of any kind was referenced or identified in the RFEIS.

Defendants respond that <u>Earth Island</u>, <u>Eubanks</u>, and <u>Tippin</u> were decided *before* the 2007 MIS Amendment and thus are inapposite.  In said Amendment, defendants assert, Congress made clear that the 2001 and 2004 Frameworks did not create any new obligations to monitor SAR, which obligations had never been incorporated into or designated in any of the Sierra Nevada forest plans.  (Voss Decl, Ex. O.)  Thus, contrary to plaintiff's argument, defendants contend the 2007 MIS Amendment establishes that no such monitoring obligations existed for SAR under even the 2004 and 2001 Frameworks.

This court recently addressed the very issue raised by this case in <u>Sierra Nevada Forest Protection Campaign v. Rey</u>, 573 F.

Supp. 2d 1316, 1336 (E.D. Cal. 2008), *overruled on other grounds,*
Sierra Forest Legacy v. Rey, 2009 WL 2462216 at *1, and found
that with respect to SAR, the 2007 MIS Amendment states
"unequivocally that there are no legal requirements for
monitoring SAR," as no such species are identified in the PNF
LRMP.  The court specifically rejected plaintiff's argument that
the Amendment itself is inconsistent with the applicable
regulations.  The 1982 regulations (which were incorporated into
the 2001 and 2004 Frameworks), relied upon by plaintiff, do not
specifically dictate how monitoring should be accomplished, and
the Ninth Circuit has held, even in the face of the 1982
regulations, that actual monitoring need not be conducted where
the FS has utilized a reliable alternative methodology.  Id.
"Consequently, Plaintiffs' argument that anything less than
monitoring cannot satisfy NFMA is misplaced."  Id.  The 2007 MIS
Amendment does not run afoul of NFMA or its implementing
regulations.

In sum, Rey is persuasive authority and will be followed by
this court.  The decision properly applies the 2007 MIS
Amendment.  Therefore, plaintiff cannot show a likelihood of
success on the merits of this NFMA claim.

### 2.   MBTA

The MBTA makes it unlawful at any time, by any means or in
any manner, to kill or attempt to kill, any migratory bird, any
part, nest, or egg of any such bird without a permit.  16 U.S.C.
§ 730(a).  Plaintiff contends the FS will do more than simply
destroy habitat because it admits that implementation of the
Moonlight-Wheeler Project will directly kill BBWO by felling

fire-killed trees before the chicks have fledged from their
nests. (Voss Decl., Ex. E [Response to Comments, p. D-58] [The
FS "acknowledge[s] that a possible direct effect of implementing
the action alternatives could be mortality of BBWO chicks that
have not yet fledged and are present within snags scheduled for
removal"].)  Plaintiff contends this admitted direct killing of
birds violates the MBTA, and the court should enjoin the felling
of any fire-killed trees while BBWO chicks are still dependent on
their nest cavities in fire-killed trees.

Plaintiff argues this case is distinguishable from City of
Sausalito v. O'Neill, 386 F.3d 1186, 1203-04 (9th Cir. 2004) and
Seattle Audubon Society v. Evans, 952 F.2d 297, 302-03 (9th Cir.
2001) in which the Ninth Circuit held that because the plaintiffs
there only alleged that migratory birds and their nests would be
disturbed through *habitat modification* there was no violation of
the MBTA.  Here, however, plaintiff contends the FS admits to
direct killing of birds, not simply habitat modification which
may lead indirectly to bird deaths.

This court disagrees.  This case is controlled by City of
Sausalito and Seattle Audubon which made clear that the MBTA does
not proscribe the killing of migratory birds resulting from
habitat modification.  In Seattle Audubon, a case also involving
a claim that timber sales violated the MBTA, the court found that
the MBTA, unlike the Endangered Species Act, does not define
"harm" to include habitat modification which results in the
killing of wildlife, by for example, significantly impairing
behavioral patterns such as "sheltering."  952 F.2d at 302-03.

57

This simply is not a "direct take" case, but an indirect takings case like <u>City of Sausalito</u> and <u>Seattle Audubon</u>--any possible killing of woodpecker chicks would result from the Project's habitat modification, which may indirectly kill birds. (<u>See</u> Voss Decl., Ex. F at 127 [noting that chicks that have not yet fledged by the start of the plan implementation could be killed "*due to* removal of occupied nest trees"]) (emphasis added).  In <u>Seattle Audubon</u>, the plaintiffs likewise argued that the agency's "own documents . . . recognize[d] that the planned timber sales in the habitat of the northern spotted owl [would] result in the death of owls."  <u>Portland Audubon Soc'y v. Lujan</u>, No. 87-1160, 1991 WL 81838, *5 (D. Or. May 8, 1991), *aff'd* <u>Seattle Audubon</u>, 952 F.2d 297.  Nevertheless, the Ninth Circuit held that the timber harvest at issue did not provide the factual predicate for a MBTA violation, namely, a direct killing. <u>Seattle Audubon</u>, 952 F.2d at 302-03; <u>see also</u> <u>Mahler v. US Forest Service</u>, 927 F. Supp. 1559, 1579 (S.D. Ind. 1996) (holding that the MBTA does not prohibit death of migratory birds resulting from logging operations "even in nesting season").

In particular, <u>Seattle Audubon</u> is factually analogous, and the court must apply its holding that the indirect killing of birds through habitat modification, resulting from logging operations, does not violate the MBTA.  Therefore, plaintiff cannot show any likelihood of success on the merits of this claim.

**B.**    **<u>Likelihood of Irreparable Harm</u>**

The Ninth Circuit has recognized that "a Forest Service logging project may, in some circumstances, fulfill the

irreparable injury criterion because of the long term
environmental consequences." Earth Island I, 351 F.3d at 1299.
Applying that caselaw, in Eubanks, 335 F. Supp. 2d at 1082-84,
for example, this court held that the proposed salvage logging
there was "enough in and of itself to satisfy the irreparable
harm component of [the] plaintiffs' preliminary injunction
request" because "once trees are removed from the landscape, they
cannot be replaced."  However, in Winter, the Supreme Court made
clear that to be entitled to the extraordinary remedy of a
preliminary injunction, a plaintiff must show a *likelihood* of
irreparable harm.  129 S. Ct. at 375-76 (holding that "[i]ssuance
of a preliminary injunction based only a possibility of
irreparable harm is inconsistent with [the Court's]
characterization of injunctive relief as an extraordinary remedy
that may only be awarded upon a clear showing that the plaintiff
is entitled to such relief").

Here, through the declarations of its experts, Hanson, Bond,
Royce and Rhodes, plaintiff makes the following showing on
irreparable harm: (1) plaintiff argues its interests may be
irreparably harmed if the FS is allowed to proceed with the
Project in violation of the procedural requirements of NEPA and
the substantive requirements of NFMA and the MBTA, due to the
environmental harm to imperiled wildlife which would flow from
removal of trees, both dead and alive (Hanson Decl., ¶s 9-28;
Bond Decl., ¶s 3-14; Royce Decl., ¶s 5-6, 13, 26), and the
degradation of soils that would occur if the Project proceeds

(Rhodes Decl., ¶s 12-85);[17] (2) the Project, plaintiff asserts, would individually and cumulatively threaten the extinction of the BBWO in the Sierra Nevada by removing about 40% of its existing suitable habitat in the Sierra Nevada Mountains (Hanson Decl., ¶s 14-24); (3) the Project would also, plaintiff claims, remove 8,510 acres (Voss Decl. Ex. A (ROD, p. 12)) of suitable California spotted owl post-fire habitat by salvage logging in four occupied spotted owl Protected Activity Centers and seven additional new locations which were occupied by owls after the fire (Bond Decl., ¶ 4); (4) the logging would remove thousands of acres of post-fire habitat favored by the owls, and would create a significant loss of owl occupancy in the Project area (Bond Decl. ¶s 5-19); (5) spotted owls would also be harmed by the logging of large, live roadside trees scheduled to be cut along dead end roads in their territories (Voss Decl., Ex. U, pp. 9-10 (¶19) & photos); (6) in addition, plaintiff contends this Project would also harm Olive-sided flycatcher populations, by removing its habitat; this bird is a species at risk and is strongly associated with burned forest habitat and its populations decline with post-fire logging (Hanson Decl. ¶ 26); and finally, (7) plaintiffs assert the Project would cause severe and irreparable soil damage, erosion, stream sedimentation, loss of

_____

[17]   Through the declarations of Hanson and Bevington, plaintiff argues its members who frequent and enjoy this area would be irreparably harmed by these environmental injuries. (See e.g., Hanson Decl. ¶ 9 ["My interest as well as the interests of the other members of [EII] will be harmed by the continued degradation of forests, and disregard of ecology, resulting from projects such as [this], which is a result of the failure of science to be utilized in the management of our public lands."]

ground cover (including most live post-fire vegetation), and loss of large woody debris needed for streams (Rhodes Decl. ¶¶ 1-85). In sum, plaintiff maintains that given that these impacts would occur on over 14,755 acres, equal to more than 23 square miles, the very probable irreparable harm would be profound, and the harm is imminent as the Project will commence immediately if the court does not grant plaintiff's motion.

Defendants respond that plaintiff's evidence is insufficient to show a *likelihood* of irreparable injury because it suffers from the same faulty reasoning and is based on the same unsound science as plaintiff's merits' claims. Defendants assert the FS evaluated the impacts and cumulative affects on each of the alleged threatened species identified by plaintiff and correctly concluded that none of plaintiff's "doomsday" predictions of harms to wildlife would come to pass. Defendants also maintain that their findings establish that the impact of the proposed action relative to erosion potential would not be higher than that of the wildfire, and natural recovery would only be prolonged by 2 to 5 years. Additionally, defendants emphasize that 78% of the fire area is not affected by the Project and will remain as unlogged burned forest. (Carlton Decl., ¶ 34(a).)

Finally, defendants argue that as opposed to plaintiff, it is defendants and the public that will be irreparably harmed by issuance of an injunction due to: (1) the increased risk that someone will be killed or seriously injured by falling hazardous trees due to advancing deterioration (Carlton Decl. ¶s 9, 17-21;

Lazzarino Decl., filed July 31, 2009, ¶s 8, 11, 12-14, 20);[18] (2)
the declining economic value of the trees (Carlton Decl., ¶
10-12, 26, 27);[19] and (3) if reforestation efforts are delayed or
not undertaken, forest regeneration would be delayed causing
irreparable harm in the form of delayed development of forest
habitat structure for wildlife (Carlton Decl., ¶s 30-32).

Considering the court has found that it is unlikely
plaintiff can demonstrate any clear error in judgment by the FS
in rendering its decision on the Project's impacts to wildlife
and the soils and watersheds, the court cannot find that
plaintiff has shown a likelihood of irreparable harm.
Defendants' experts' testimony seriously undermines the soundness
of plaintiff's claims of likely irreparable harm such that the
court cannot find that plaintiff has made the requisite showing
under Winter.  No longer is there any presumption of such harm in
an environmental case, nor is a showing of a mere possibility of
irreparable harm sufficient.  Plaintiff's reliance on pre-Winter
caselaw is therefore wholly unavailing.  (See Pl.'s Mem. of P. &

---

[18]    Defendants submit evidence that, contrary to
plaintiff's arguments, simply closing affected roads is not
feasible and there is a real safety risk to road users, which
include members of the public such as owners of private lands in
the PNF, PNF employees and contractors, recreational users of the
Forest, permit holders, and researchers who conduct wildlife
inventories and other projects on the Forest.  (Carlton Decl., ¶s
16-18, Ex. 3, 4; Lazzarino Decl., ¶s 6, 22.)  As set forth above,
defendants also dispute plaintiff's evidence regarding wide-
spread mismarking of trees under the guidelines.

[19]    The FS must rely on commercial operators to do the work
as the cost of the FS doing the Project itself would be almost
double the entire annual PNF budget for road maintenance.
(Carlton Decl., ¶s 10-12, 26, 27, Exs. 3, 4; Lazzarino Decl., ¶
19.)  Once the damaged trees lose their residual value,
commercial operators will no longer be interested in performing
the project.  (Carlton Decl., ¶s 10-12, 26, 27.)

A., filed July 24, 2009, at 20:16-21:13 [citing Ninth Circuit cases from 1984 to 2003].)  While plaintiff's showing here may well be sufficient to show a *possibility* of irreparable injury, to be entitled to the extraordinary remedy of preliminary injunctive relief, plaintiff must show a *likelihood* of such injury.  It has failed to do so.

**C.   Balance of the Equities & the Public Interest**

It has long been generally recognized that "[e]nvironmental injury, by its nature, [is] seldom . . . adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable[,]" and thus, "[i]f such injury is sufficiently likely, . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987). However, in McNair, the Ninth Circuit stressed that:  "The Supreme Court has not established that, as a rule, any potential environmental injury merits an injunction . . . Our law does not . . . allow us to abandon a balance of harms analysis just because a potential environmental injury is at issue."  537 F.3d at 1004-05.  Indeed, the McNair court emphasized that the Supreme Court has instructed that courts should not "exercise [their] equitable powers loosely or casually whenever a claim of 'environmental damage' is asserted."  Id. at 1004.  Thus, in evaluating the instant motion, this court must balance all of the competing interests at stake.

Plaintiff argues, for the reasons set forth above, that it has demonstrated it will likely suffer irreparable injury if logging is allowed to proceed.  Plaintiff contends that

defendants, on the other hand, have no valid interest in
violating the law and will not suffer any harm if the court
enjoins the Project until they have complied with NEPA, NFMA and
the MBTA.  To the extent that defendants claim a financial harm,
plaintiff argues it has been determined that economic injury,
even if it is present, is not "irreparable," Sampson v. Murray,
415 U.S. 61, 90 (1974), and this court has found that the loss of
the timber industry's "private prospective profits" does not
amount to "unusual circumstances" that might limit or preclude
injunctive relief.  State of California v. Bergland, 483 F. Supp.
465, 499, n. 43 (E.D. Cal. 1980); accord Sierra Nevada Forest
Protection Campaign, 2006 WL 2583036 at *20 n. 24.  Plaintiff
points out that while the FS has offered five timber sales for
bid, it is requiring any prospective bidder to waive liability
should the sales be enjoined and has provided a notice that this
project is in litigation and the sales may be delayed, stopped or
cancelled.  Thus, plaintiff asserts creating a circumstance where
any economic harm to defendants or contractors was entirely
preventable and was the result of defendants' voluntary actions.
Accordingly, plaintiff contends the court should not balance the
equities in defendants' favor.

As discussed above, defendants argue that the balance of
equities weigh against issuance of an injunction considering the
serious public safety risk and the loss of economic value of the
trees and the benefits of reforestation if the Project is
enjoined.  Defendants also stress that the public interest is
best served by allowing the Project to proceed since it will help
the local, struggling economy; the Project will create over 2000

1  direct and indirect jobs over the one to two-year life of the

2  Project.  (Carlton Decl., ¶ 26.)

3       While the court must seriously consider the potential harm

4  to the environment caused by the Project, where plaintiff has not

5  made the requisite showing on the merits which, in turn,

6  undermines the likelihood of irreparable injury, the balance of

7  equities cannot be found in plaintiff's favor.  Defendants have

8  proffered evidence that if the Project does not go forward: (1) a

9  real safety risk exists to the public as a result of hazardous

10  trees; (2) the public will lose the benefit of a boost to the

11  local economy as a result of the creation of jobs by the Project;

12  (3) the public will lose the benefits of the reforestation

13  efforts, which will expedite forest regeneration, recover

14  forested conditions, prevent domination of shrub species, and

15  repair habitat structure for wildlife; and (4) the government

16  will lose the opportunity to receive the prime economic value of

17  the timber and could lose the ability to do the Project at all if

18  it is delayed, causing the economic value of the timber to

19  decline.

20       These facts tip the balance of equities in favor of

21  defendants in this case and counsel against issuance of an

22  injunction which would not be in the public's best interest.

23                              **CONCLUSION**

24       For the foregoing reasons, plaintiff's motion for a

25  preliminary injunction enjoining the FS's implementation of the

26

27

28

1  Moonlight-Wheeler Project is DENIED.

2      IT IS SO ORDERED.

3  DATED: August 20, 2009

4

5  _____

6  FRANK C. DAMRELL, JR.
   UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28