UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

EARTH ISLAND INSTITUTE,                No. 2:09-cv-02020-MCE-EFB
a non-profit organization,

      Plaintiff,

    v.                                 <u>MEMORANDUM AND ORDER</u>

ALICE B. CARLTON, in her
official capacity as Forest
Supervisor for Plumas National
Forest, RANDY MOORE, in his
official capacity as Regional
Forester for Region 5 of the
United States Forest Service,
and the UNITED STATES FOREST
SERVICE,

      Defendants.

----oo0oo----

    This matter arises out of Plaintiff's claims that Defendants

approval of the Moonlight-Wheeler post-fire logging and

restoration project, located in Plumas National Forest in the

northern Sierra-Nevada mountain range, violated the National

Forest Management Act and the National Environmental Policy Act.

///

///

1

Presently before the court are the parties' cross-motions for summary judgment.[1]  For the reasons set forth below, Plaintiff's motion is DENIED and Defendants' motion is GRANTED in its entirety.

## BACKGROUND[2]

### A.    Brief Factual Background

Both this court and the Ninth Circuit set forth the relevant facts of this case in intricate detail in their respective memoranda denying Plaintiff's motion for preliminary injunction. To this end, the court only recounts those facts necessary to provide sufficient context for court's analysis.

The Moonlight and Wheeler fires burned through portions of the Plumas and Lassen National Forests in the summer of 2007. The majority of the fire burned at both moderate and high severity.  In total, of the acres burned by the Moonlight and Wheeler fires, approximately 78% was on the PNF and 22% was on private land.

///

///

///

_____

[1] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs.  E.D. Cal. Local Rule 230(g).

[2] The facts of this case are, for the most part, undisputed. In recounting the relevant facts, the court cites to the Administrative Record ("AR") and the Supplemental Administrative Record ("SAR").

The fires burned approximately 41,000 acres of National Forest
land with high severity such that "it resulted in a deforested
condition characterized by relatively large areas of standing
dead trees" ("snags"), "where seed source of desired species is
insufficient to naturally regenerate these areas."  (AR 276.)
Such moderate and high severity burn areas are the most habitable
environment for the Black-Backed Woodpecker (BBWO).

The Plumas National Forest (PNF) is managed in accordance
with the PNF Land and Resource Management Plan (PNF Plan),
originally adopted in 1988.  (AR 10579.)  The PNF Plan was
amended in 2004 (AR 10445) and again in 2007 by the Management
Indicator Species[3] (MIS) Amendment (AR 10308).  The 2007 MIS
added a number of MIS species, including the BBWO, which the USFS
is required to monitor at the bioregional scale.  The monitoring
strategy selected for MIS, including the BBWO, are habitat trend
monitoring and distribution population monitoring at the Sierra
Nevada regional level "by monitoring the changes in the presence
of the species across a number of sample locations."  (AR 10308
[2007 MIS Amendment ROD at 2].)

In response to the alteration of the forest resource
conditions caused by the fires, the United States Forest Service
(USFS) recognized the need to undertake a combination of
management activities, including both restoration and timber
harvest.

///

///

_____
[3] An MIS is a bellweather species that is used to identify
by proxy the available suitable habitat for similar species.

3

USFS therefore proposed the project to address several purposes: (1) to "remove hazardous trees with structural defects" that pose a safety risk to the public and USFS employees along a 123-mile stretch of National Forest road; (2) to "recover the value of fire-killed trees before natural deterioration occurs . . . and provid[e] a wood supply for . . . sustaining a part of the employment base in rural communities"; and (3) to plant native conifer seedlings to expedite forest regeneration, recover forested conditions and prevent domination of shrub species. (AR 275-76, 288.)

On June 16, 2009, USFS issued its Revised Final Environmental Impact Statement (RFEIS).  (AR 262.)  The RFEIS considers five alternatives in detail: the no-action alternative (Alternative B); three action alternatives (Alternatives A, C, D) involving a combination of timber harvest, hazard tree removal, and restoration activities; and a fifth action alternative (Alternative E) consisting of hazard tree removal and restoration activities only.  (AR 284-99.)  Six other alternatives were previously considered, including one proposed by plaintiff that was eliminated from the study for various reasons.  (AR 300-306.) Attached as an exhibit to the RFEIS, USFS provided extensive responses to comments previously submitted by Plaintiff regarding the Revised Draft Environmental Impact Statement.  (See AR 587-667.)

On July 12, 2009, the USFS signed the Record of Decision (ROD) for the Moonlight-Wheeler Project, adopting Alternative A for implementation.  (AR 203.)

///

4

1   The ROD identified Alternative A as the alternative that "best
2   meets the needs identified for this project" and as "consistent
3   with the goals and objectives of the [PNF Plan]." (AR 209.)
4   This conclusion was "based on a thorough review of the best
5   available science, consideration of responsible opposing views,
6   and the acknowledgment of incomplete or unavailable information.
7   (Id.)  The selected alternative authorized timber harvest of
8   fire-killed trees on approximately 10,366 total acres of the
9   41,290 acres of high vegetation burn severity areas using ground
10  based, skyline and helicopter harvest methods.  (Id.)   In
11  addition, harvest of fire-killed or dying (fire-injured) conifer
12  hazard trees was authorized on 4,389 acres along 123 miles of
13  road.  (Id.)

14       According the PNF contracting officer, to date "no
15  additional salvage logging units will be offered for sale under
16  the Moonlight-Wheeler ROD"; therefore, there will be no more
17  logging under the moonlight-wheeler project.  (Decl. of Elaine
18  Gee, filed Oct. 17, 2011, [ECF No. 97] ¶¶ 9-10.)[4]
19  ///
20  ///
21  ///
22  ///
23  ///

24  _____

25       [4] According to Gee's declaration, although the ROD
    "authorized logging on 14,755 acres of burned forest within the
26  . . . project area," "only 7,988 acres have been logged, and no
    additional salvage logging units will be offered."  (Id. ¶ 10.)
27  Therefore, "[n]ot all fire-killed trees of merchantable size
    authorized for harvest were felled or removed," leaving "more
28  snags remaining within the salvage logging units post-logging
    than originally anticipated."  (Id.)

1    Plaintiff now contends that it is entitled to summary
2    judgment on its claims that the Project violated NEPA and NFMA.
3    Specifically, Plaintiff contends that Defendants violated NEPA
4    by: (1) failing to ensure the scientific integrity of USFS'
5    analysis of the Project's impact on the BBWO; (2) failing to
6    meaningfully respond to dissenting scientific opinion regarding
7    the BBWO; (3) failing to take a hard look at the impacts of the
8    Project; and (4) failing to prepare a Supplemental Environmental
9    Impact Statement in light of new information concerning the BBWO.
10   Plaintiff avers that Defendants violated NFMA by failing to
11   ensure the viability of the BBWO, as allegedly required by the
12   PNF; specifically, failing to determine the necessary quantity
13   and quality of habitat necessary for viability of the BBWO.
14   Defendants also filed a motion for summary judgment, arguing that
15   Plaintiff has failed to provide sufficient evidence to establish
16   each essential element of their claims, and thus, Defendants are
17   entitled to judgment as a matter of law.

18

19   **B.    Procedural Background**

20

21    On July 24, 2009, Plaintiff moved this court to preliminary
22   enjoin implementation of the project. (Pl.'s Mot. for Prelim.
23   Inj., filed July 24, 2011, [ECF No. 13].)  This court, by
24   memorandum and order, on August 20, 2009, denied Plaintiff's
25   motion. (Court's Mem. & Order, filed Aug 20, 2009, [ECF
26   No. 53].)
27   ///
28   ///

Relevant for purposes of this motion, the court held that the RFEIS ensured the scientific integrity of its analysis; USFS adequately responded to dissenting scientific opinion; and complied with the PNF Plan. (See generally id.) Thus, the court held that Plaintiff did not demonstrate a likelihood of success on the merits of either their NEPA or NFMA claims. (Id.) As a general matter, the court determined that, based on the opposing declarations and exhibits filed by the respective parties, the question came down to a battle of the experts. (Id. at 26:22-23,) The court therefore deferred to the Agency's expertise, as required by the Administrative Procedures Act (APA). The Ninth circuit affirmed the District Court's denial of the motion in all regards. (USCA Op., filed Nov. 8, 2010, [ECF No. 69]; Earth Island Institute v. Carlton, 626 F.3d 462 (9th Cir. 2010).) Plaintiff filed an amended complaint on June 26, 2008.[5] (Pl.'s First Am. Compl., filed Jun. 26, 2008, [ECF No. 84].)

**STANDARD**

A.   **Summary Judgment**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

---

[5] Plaintiff's original complaint contained a number of claims that were omitted by the amended complaint Plaintiffs filed after denial of their motion for a preliminary injunction.

Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id.</u> at 324. Indeed, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Id.</u> at 322. In such a circumstance, summary judgment should be granted "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id.</u> at 323.

Summary judgment is appropriate in cases, like the present matter, which involve judicial review of administrative action where review is based upon an administrative record. <u>National Wildlife Fed'n v. Babbitt</u>, 128 F. Supp. 2d 1274, 1289, <u>see also</u> <u>Northwest Motorcycle Ass'n v. U.S. Dept. Of Agriculture</u>, 18 F.3d 1468 (9th Cir. 1994). In such cases, summary judgment is a unique procedure, more akin to a motion to dismiss.

///

1  See Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221,

2  1226 (D.C. Cir. 1993).  The court's role in considering summary

3  judgment in this context is not so much to resolve contested

4  questions of fact which may exist in the record; instead, "the

5  court must determine the legal question of whether the agency's

6  action was arbitrary and capricious."  Gilbert Equip. Co., Inc.

7  v. Higgins, 709 F. Supp. 1071, 1077 (S.D. Ala. 1989), aff'd,

8  894 F.2d 412 (11th Cir. 1990); see also Occidental Eng'g Co. v.

9  INS, 753 F.2d 766, 769 (9th Cir. 1985) (stating the court's role

10 "is to determine whether or not as a matter of law the evidence

11 in the administrative record permitted the agency to make the

12 decision it did").

13

14    **B.   APA Standard**

15

16     Plaintiff brings the instant challenges under NEPA and NFMA

17 pursuant to the APA.  Thereunder, the court may set aside a final

18 agency action only where the action is "arbitrary, capricious, an

19 abuse of discretion, or not otherwise in accordance with the

20 law."  5 U.S.C. § 706.  Review under the APA is "searching and

21 careful."  Ocean Advocates v. United States Army Corps of Eng'rs,

22 361 F.3d 1108, 1118 (9th Cir. 2004).  However, the court may not

23 substitute its own judgment for that of the agency.  Id.   In

24 short, the court must ensure that the agency has taken a hard

25 look at the environmental consequences of its proposed action.

26 Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526

27 (9th Cir. 1997).

28 ///

As part of this inquiry, the court should ask "whether the []
decision was based on a consideration of the relevant factors and
whether there has been a clear error in judgment." Ocean
Advocates, 361 F.3d at 1118.  In addition, the court determines
"whether the agency articulated a rational connection between the
facts found and the choice made." Id. at 1118-19 (quoting
Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife
Serv., 273 F.3d 1229, 1236 (9th Cir. 2001)).

     Recently, in The Lands Council v. McNair, 537 F.3d 981
(9th Cir. 2008), the Ninth Circuit emphasized a court's proper
role in reviewing agency action in an environmental case:[6]  The
court reaffirmed that the role of the court is necessarily at its
most deferential when assessing the agency's consideration of
technical matters.  Id. at 993 (recognizing that the court is not
to make "fine-grained judgments of [the science's] worth").  The
court is to be "'most deferential'" when the agency is "'making
predictions, within its [area of] special expertise, at the
frontiers of science.'"  Id. (citing Forest Guardians v. U.S.
Forest Serv., 329 F.3d 1089, 1099 (9th Cir. 2003)).  In that
role, a reviewing court is not to entertain a "battle of the
experts" when plaintiffs proffer expert testimony to set against
the agency's professional judgment.  Id. at 1000.

---

     [6] Indeed, the court remarked that "in recent years, [the
court's] environmental jurisprudence has, at times, shifted away
from the appropriate standards of review and could be read to
suggest that this court should play . . . [the] role" of a "panel
of scientists that instructs the [FS] how to validate its
hypotheses . . . [how to] choos[e] among scientific studies
. . ., and orde[r] the agency to explain every possible
scientific uncertainty."  Id. at 988.  However, the court in
McNair made clear that this is not a role the court should play
under APA review.  Id.

"When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." <u>Id.</u>  Ultimately, the reviewing court must:

> look to the evidence the [USFS] has provided to support its conclusions, along with other materials in the record, to ensure the [USFS] has not, . . . relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

<u>Id.</u> at 993 (internal quotations omitted).  As a "non-scientist," the court cannot impose bright-line rules on USFS regarding particular means that it must take in every case to show compliance with NEPA's and NFMA's requirements.  <u>Id.</u> at 994-94.  Rather, the "FS must support its conclusions that a project meets the [laws'] requirements . . . with studies that the agency, in its expertise, deems reliable.  The [FS] must explain the conclusions it has drawn from its chosen methodology and the reasons it considers the underlying evidence to be reliable." <u>Id.</u> at 994.  The court may conclude that the FS acts arbitrarily and capriciously only when the record "plainly demonstrates that the [FS] made a clear error in judgment" in concluding that a project meets the requirements of NEPA and NFMA.  <u>Id.</u>

///
///
///
///

**ANALYSIS**

**A.    NEPA**

NEPA mandates that federal agencies prepare a detailed Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  These statements must include a description and analysis of the environmental impact of the proposed action, any adverse environmental effects that cannot be avoided if the action is implemented, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and any irreversible or irretrievable commitment of resources that would be involved if the action were to be implemented.  Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1153 (9th Cir. 2006) ("Earth Island II").  "In short, NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action' and 'inform the public that it has indeed considered environmental concerns in its decision-making process.'"  Id. (quoting Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1066 (9th Cir. 2002)).

Plaintiff makes four central arguments for why Defendants violated NEPA in the preparation of the RFEIS: (1) the USFS failed to ensure the scientific accuracy and integrity of the EIS and failed to disclose its methodology; (2) the USFS failed to meaningfully respond to dissenting scientific opinion in the EIS; ///

12

(3) the USFS failed to take a hard look at the impacts of the project on the BBWO; and (4) the USFS failed to prepare a supplemental EIS in light of a new study on BBWO viability.

Plaintiff makes the first argument with respect to the USFS' alleged misrepresentation of the science relating to the BBWO. Plaintiff makes the second argument, regarding the USFS's alleged disregard of Mr. Hanson's dissenting scientific opinion, with respect to the viability of the BBWO.  Plaintiff's third argument is basically a recapitulation of the first two arguments. Finally, Plaintiff's fourth argument avers that USFS' decision to not issue a supplemental EIS response in light of the 2011 Burnett Study (Supplemental Administrative Record ["SAR"] 18694) was in clear error.

### 1.    The Forest Service Ensured the Scientific Integrity of the Project's Impact on the BBWO

Plaintiff contends that the RFEIS fails to ensure the scientific integrity of its analysis of the impact of the BBWO because it misrepresents five studies cited by the RFEIS and the ROD.  Specifically, Plaintiff contends that none of the studies cited in the RFEIS are able to provide trend data regarding the BBWO's population distribution, and thus, the RFEIS improperly concluded that "the distribution of black-backed woodpeckers population throughout the Sierra Nevada is stable."  (AR 376.)

///

///

///

1    Defendants counter that, contrary to Plaintiff's contention,
2    the studies relied on by the USFS purport to make a showing
3    regarding the distribution of BBWO across the Sierra Nevada
4    region, rather than trend in population numbers.  The forest
5    service maintains that the studies relied on reported widely
6    distributed sighting of BBWO, which, cumulatively, provided
7    historical and current distribution of BBWO in the Sierra Nevada
8    Region.  USFS asserts that these studies, "considered together,"
9    adequately supported its conclusion that the project would leave
10   sufficient habitat for the BBWO.

11   Under NEPA, "[a]gencies shall insure the professional
12   integrity, including scientific integrity, of the discussions and
13   analyses in environmental impact statements.  They shall identify
14   any methodologies used and shall make explicit reference by
15   footnote to the scientific and other sources relied upon for
16   conclusions in the statement."  40 C.F.R. § 1502.24.  At bottom,
17   an agency fulfills its statutory duties when it "take[s] a hard
18   look at the issues and responds to reasonable opposing
19   viewpoints."  Earth Island Inst. v. U.S. Forest Serv., 351 F.3d
20   1291, 1301 (9th Cir. 2003) ("Earth Island I")

21   Plaintiffs have failed to show that the RFEIS arbitrarily or
22   capriciously concluded any of the following: (1) 68% of the
23   analysis area [suitable for BBWO nesting] would not be salvage
24   logged. . . . [and] would be available as BBWO habitat somewhere
25   between 5 and 7 years"; (2) "there would still be short term
26   population increase resulting from the suitable habitat remaining
27   after the proposed project; (3) the BBWO is "widely distributed
28   across recently burned forest";

(4) 80% of forested areas which burned at high severity between 2000 and 2008 would still support potential BBWO habitat; and (5) the project "provides enough habitat (snags in burned forest) to theoretically support an additional 65-1,020 pairs" of BBWO. (See AR 375-376; 399-404.)

These conclusions were based in large part on a 2008 survey which monitored BBWO at 68 of 371 survey stations, in 10 of 19 fire areas. (AR 402.) One study Plaintiff contends USFS misrepresented by stating that the BBWO trend was stable explicitly and unequivocally undermines Plaintiff's assertion. That study expressly states: "Current data at the range-wide, California, and Sierra Nevada scales indicate that the distribution of black-backed woodpecker populations in the Sierra Nevada is stable." (AR 18909 [2008 Sierra Nevada MIS Report at 39].) This statement corresponds directly with the overall conclusion in the RFEIS — that the selected post-fire logging project would leave sufficient suitable habitat so as to not disturb BBWO viability.

Moreover, a review of those studies Plaintiff points out concretely demonstrates that USFS did not arbitrarily conclude that the BBWO is well-distributed across the Sierra-Nevada range. See AR 376 (RFEIS); see also AR 7755 (CA Partners in flight map showing BBWO distributed throughout Sierra Nevada); AR 8585-8600 (Siebel and Kaschube 2007) (providing trend data indicating BBWO was located at 5 of 29 stations operated in Sierra Nevada). In this case, USFS had discretion to choose the studies it relied on, and to consider them in conjunction; those studies support the RFEIS' conclusions regarding BBWO distribution.

1  As such, the court cannot find that Defendants acted either

2  arbitrarily or capriciously in relying on those studies.

3        Plaintiff's claim in this regard fails for the same reason

4  this Court and the Ninth Circuit found the claim was not

5  sufficient to merit a preliminary injunction.  Specifically,

6  Plaintiff has asked this court to engage in a "battle of the

7  experts," an engagement the APA proscribes.  The court, citing to

8  the RFEIS and the studies relied on therein, explained in its

9  memorandum denying Plaintiff's request for a preliminary

10  injunction:

> As to plaintiff's specific claim that the [US]FS
> violated NEPA by misrepresenting the status of the BBWO
> population, and failing to ensure the Project would
> not threaten BBWO viability, defendants proffer evidence
> that the USFS adequately considered and evaluated
> studies on BBWO trends and determined the Moonlight and
> Wheeler fires created 32,569 acres of suitable BBWO
> habitat in the Project Area.  The RFEIS references an
> MIS trend report, summarized the suitable habitat and
> distribution population trends from the report, and
> concluded that the data indicate that BBWO continue to
> be distributed across the Sierra Nevada and that
> distributions of BBWO populations in the Sierra Nevada
> [are] stable. Furthermore, the [US]FS determined that
> the Project implementation would still leave 20,172
> acres of newly available BBWO habitat compared to
> pre-fire (2002) conditions which would result in a
> short term population increase compared to pre-fire
> conditions, and, not threaten viability.

21  (Mem. & Order at 33:4-22) (internal citations and quotations

22  omitted).  As such, the court held, "[US]FS reasonably considered

23  areas where BBWO have been detected and conditions that they have

24  been observed to use as a framework for describing suitable

25  habitat, and the [US]FS also reasonably concluded that

26  populations would increase above previous levels such that the

27  viability of the woodpecker would not be threatened. Id. at

28  34:18-24.

1   Nothing about the studies Defendants have relied has changed
2   since the issuance of the court's order.

3        The court's "role is simply to ensure that the forest
4   service made no clear error of judgment that would render its
5   action arbitrary and capricious." Earth Island Institute v.
6   Carlton, 626 F.3d 462, 472 (9th Cir. 2010) (quoting Mcnair,
7   537 F.3d at 993).  In this case, Plaintiff simply cannot show
8   that USFS arbitrarily concluded that the project would not
9   threaten BBWO viability as it relied on a number of studies which
10  support USFS' conclusion that the project would leave sufficient
11  BBWO habitat so as to not threaten BBWO viability.

12
13            **2.    USFS Adequately Responded to Dissenting Scientific**
14                    **Opinion**

15
16       Plaintiff's argument in this regard is essentially the same
17  argument presented to the court and the Ninth Circuit at the
18  preliminary injunction stage.  Specifically, Plaintiff maintains
19  that, in responding to Dr. Hanson's comments, USFS failed to
20  adequately respond to Hanson's contention that the studies cited
21  by the RFEIS were misrepresented.  Plaintiff further maintains
22  that NEPA requires USFS' response to be contained in the body of
23  the environmental impact statement and not relegated to an
24  appendix or response to comments section. (Pl.'s Opp'n [citing
25  40 C.F.R. § 1502.9; Center for Biological Diversity, 349 F.3d at
26  1169].)
27  ///
28  ///

1  Defendant contends that — as the District Court held and the
2  Ninth Circuit affirmed — USFS provided an adequate response to
3  Hanson's comments and that NEPA is not violated simply because
4  Hanson was not satisfied by USFS' explanation.  USFS points
5  directly to the extensive comment section attached to the RFEIS,
6  which contains a section that explicitly addressed Hanson's
7  comments.  (See AR 618-631.)  Defendants further maintain that no
8  rule of law precludes USFS from responding in a comment section
9  attached as an appendix to the EIS.  Finally, USFS asserts that
10 Hanson's comments did not constitute "opposing scientific
11 viewpoints" because he failed to provide any scientific
12 literature that "contradict or call into question [USFS']
13 conclusion"; Hanson merely points out what he views as analytical
14 flaws in USFS' analysis of the sources cited. (Gov.'s Reply,
15 filed Dec. 7, 2011 [ECF No. 100] at 13: 10-13.)  Thus, USFS
16 avers, Hanson's opinions were "general 'substantive comments'"
17 that do not require further response than those USFS provided.
18 Id. (citing Oregon Natural Resources Council v. Marsh, 852 F.2d
19 1489 (9th Cir. 1987), rev'd on other grounds[7]).

20     In ensuring the scientific integrity of their analysis,
21 agencies "shall discuss at appropriate points in the final
22 statement any responsible opposing view which was not adequately
23 discussed in the draft statement and shall indicate the agency's
24 response to the issues raised."  40 C.F.R. §§ 1502.9(b), 1502.24.
25 ///

26

27     [7] The Supreme Court reversed only Ninth Circuit's
   articulation of the standard for providing a supplemental EIS.
28 See infra.

18

While courts have strictly enforced NEPA's requirement to address

contrary scientific opinion,[8] ultimately, agencies must be given

wide discretion in assessing scientific evidence.  <u>Carlton</u>,

626 F.3d at 472.  Indeed, the Ninth Circuit has recognized:

> [A]n agency's obligation to respond to public comment
> is limited.  Not every comment need be published in the
> final EIS.  Nor must an agency set forth at full length
> the views with which it disagrees.  Moreover, an agency
> is under no obligation to conduct new studies in response
> to issues raised in the comments, nor is it duty-bound
> to resolve conflicts raised by opposing viewpoints.

<u>California v. Block</u>, 690 F.2d 753, 772 (9th Cir. 1982) (citations

omitted); <u>Navajo Nation v. U.S. Forest Serv.</u>, 479 F.3d 1024, 1057

(9th Cir. 2007); 40 C.F.R. § 1503.4.  At bottom, an agency

fulfills its statutory duties when it "take[s] a hard look at the

issues and responds to reasonable opposing viewpoints."  <u>Earth</u>

<u>Island Inst. v. U.S. Forest Serv.</u>, 351 F.3d 1291, 1301

(9th Cir. 2003) ("<u>Earth Island I</u>").

    Contrary to Plaintiff's assertion that USFS did not

adequately respond to Dr. Hanson's concerns regarding viability

of BBWO, in the comments section of the RFEIS, USFS devoted

thirteen pages to acknowledging, analyzing, and addressing

Dr. Hanson's comments.  (<u>See</u> AR 618-631 [RFEIS, Appendix D at

32-45].)

///

---

[8] <u>See</u> <u>e.g.</u>, <u>Earth Island II</u>, 442 F.3d at 1172-1173 (USFS "cannot assume that simply because the [spotted] owl studies are preliminary, the adverse impacts discussed therein will not occur . . . the FEISs must respond explicitly and directly to conflicting views in order to satisfy NEPA's procedural requirements"); <u>accord Sierra Nevada Forest Protection Campaign v. Tippin</u>, 2006 WL 2583036, *8 n. 10, *10-14 (E.D. Cal. Sept. 6, 2006)

1   Indeed, USFS meticulously laid out each of Hanson's contentions

2   regarding the projects potential effect on BBWO and responded

3   accordingly.

4       This court's order on Plaintiff's motion for preliminary

5   judgment is enlightening:

6       [T]he [US]FS specifically addressed each of Hanson's
        contentions, described above, in the [Revised Draft
7       Environmental Impact Statement] process, and its
        rejection of Hanson's views is further explained in the
8       RFEIS.

9       Based on the evidence proffered by [D]efendants,
        [P]laintiff will be unlikely to show that the [US]FS
10      failed to consider Hanson's contrary views.  Indeed,
        the [US]FS responded in the comment period to Hanson's
11      opinions, explaining why the [US]FS agreed or disagreed
        with his conclusions, and how it used the scientific
12      studies in determining suitable habitat for
        woodpeckers.  NEPA only requires the [US]FS to consider
13      and respond to comments, not to agree with them.  The
        court finds that plaintiff is likewise unlikely to
14      succeed on the merits of this NEPA claim.

15  (Mem & Order at 37:16-38:13 [internal citations omitted].)

16      The Ninth Circuit expressly confirmed the District Court's

17  holding:

18      [T]he district court cited to numerous instances in the
        RFEIS where the Forest Service responded in detail to
19      the specific comments raised by Earth Island. For
        example, the court found that the Service commented on
20      the adequacy of the roadside hazard tree guidelines,
        the alleged improper markings of hazard trees, the
21      impact on woodpeckers and their habitat, and the impact
        of logging on post-fire soils and watersheds. Thus,
22      Earth Island's contention that the Service only
        responded in a generalized manner is factually
23      incorrect.

24  Carlton, 626 F.3d at 473.

25      A review of the record clearly supports both courts'

26  conclusion: it is clear that the agency directly and deliberately

27  responded to the various points articulated by Dr. Hanson.

28  ///

1   Since the agency is free to respond in the manner it sees fit,
2   the fact that Plaintiff and Hanson were unconvinced by that
3   response does not lead to the conclusion that USFS failed to
4   meaningfully respond to Hanson's comments.

5        Moreover, Plaintiff's legal conclusion that the response to
6   Dr. Hanson's dissenting scientific opinion must be contained in
7   the body of the EIS if simply erroneous — nothing in 40 C.F.R.
8   § 1502.9(b)[9] requires that the response be in the body of the
9   EIS.  Moreover, <u>Center for Biological Diversity</u>, cited by
10  Plaintiff for this assertion, merely states that the response
11  cannot come in the administrative record <u>outside</u> of the EIS; it
12  does not hold that the response cannot come in an appendix to the
13  EIS.  <u>Id.</u> at 1169 (holding that response must come in the <u>text</u> of
14  the EIS.)  Indeed, in analyzing 40 C.F.R. § 1502.9(b), the Ninth
15  Circuit has explicitly held that "an agency may place responsible
16  opposing views in a separate 'comments and responses' section,"
17  as USFS did here.  <u>Marsh</u>, 832 F.2d 1489, 1498.  Thus, Plaintiff's
18  argument in this regard is simply unavailing.

19  ///
20  ///
21  ///
22  ///
23  ///
24  ///

25

26  [9] 40 C.F.R. § 1502.9(b) states: "Final environmental impact
    statements shall respond to comments as required in Part 1503 of
    this chapter. The agency shall discuss at appropriate points in
27  the final statement any responsible opposing view which was not
    adequately discussed in the draft statement and shall indicate
28  the agency's response to the issues raised."

1          **3.   USFS Took a Hard Look at the Impacts of the**

2              **Project on BBWO**[10]

3

4          Plaintiff's argument in support of this claim is essentially

5     a recapitulation of the arguments made in support of the previous

6     two NEPA claims analyzed above.   Specifically, Plaintiff, again,

7     points out that "Dr. Hanson . . . concluded that the population

8     [of BBWO] is now so low that there is a significant risk of

9     extinction."   (Pl.'s Mot. at 21:10-14.)   Plaintiff repeats its

10    assertion that Defendants failed to take a hard look by not

11    adequately responding to Dr. Hanson's comments and

12    mischaracterizing the impact of the Project on BBWO.   Defendant

13    points out that these arguments are essentially the same as those

14    previously asserted, and emphasizes that "Plaintiff's

15    disagreement with the agency's conclusion does not establish a

16    violation of NEPA."   (Def.'s Mot at 23:24-25.)

17          NEPA establishes procedural requirements to ensure that

18    agencies take a "hard look" at the environmental impacts of their

19    actions.   See Ocean Advocates, 361 F.3d at 1125.   Agencies

20    must consider all foreseeable direct, indirect, and cumulative

21    impacts and include a candid discussion of adverse impacts — one

22    that does not "improperly minimize negative side effects."

23    ///

24    ///

25    ///

26

27          [10] This was not an argument brought before the district
      court on the motion for summary judgment.   It was added with the
28    amended complaint.

22

1  Earth Island Inst., 442 F.3d at 1154, 1159 (9th Cir. 2006)

2  (citing Kern v. Bureau of Land Mgmt., 284 F.3d 1062, 1066

3  (9th Cir. 2002)); Idaho Sporting Cong. v. Rittenhouse, 305 F.3d

4  957, 973 (9th Cir. 2002).  In reviewing the adequacy of an EIS or

5  EA, the Ninth Circuit applies the "rule of reason" standard,

6  "which requires 'a pragmatic judgment whether the EIS's form,

7  content and preparation foster both informed decision-making and

8  informed public participation.'"  Native Ecosystems Council v.

9  United States Forest Service, 418 F.3d 953, 960 (9th Cir. 2005);

10 see also Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,

11 387 F.3d 989, 993 (9th Cir. 2004); accord Metcalf v. Daley,

12 214 F.3d 1135, 1142 (9th Cir. 2000).  Again, however, whether

13 USFS failed to take a hard look is governed by the arbitrary and

14 capricious standard.

15      Defendants' argument in this regard is on point: as set

16 forth above, USFS responded, in detail, to each of Dr. Hanson's

17 comments in appendix D to the RFEIS.  (AR 587.)  Moreover, as

18 explained above, USFS' analysis was neither arbitrary nor

19 capricious.  Indeed, the RFEIS specifically acknowledges the

20 potential negative effects of the project: "[i]mplementation of

21 fire-killed or roadside hazard trees would result in a decline in

22 BBWO habitat availability and distribution across the PNF."

23 (AR 402 [RFEIS at 129].)  Nevertheless, USFS concluded that 62%

24 of BBWO habitat created in the analysis area would remain after

25 the project.  (AR 401 [RFEIS, Table 67].)

26 ///

27 ///

28 ///

23

Moreover, based on those scientific studies demonstrating wide-spread distribution of BBWO in the Sierra Nevada, USFS concluded that "there would still be a short term population increase resulting from the suitable habitat remaining after the proposed project."  (AR 402 [RFEIS at 129]; see also id. at 403 ("The pilot study results indicate that the black-backed woodpecker is 'widely distributed across recently burned forest stands in the 10 Sierra Nevada national forests.")

In sum, based on the thorough nature of the RFEIS and the substantive responses to Dr. Hanson's comments, Plaintiff does not have a viable claim for failure to take a hard look at the impacts of the project on the BBWO.

### 4.    Failure to Prepare a Supplemental EIS

Plaintiff's claim in this regard rests exclusively on the Burnett study (2011) (SAR 18694), which Plaintiff contends provided significant new information concerning the potential effects of the Project on BBWO.  This new data, Plaintiff maintains, required Defendant to prepare a supplemental EIS pursuant to NEPA.  Specifically, Plaintiff contends that USFS' supplemental information report ("SIR"), issued in response to the Burnett study, "improperly minimized side effects" and "failed to demonstrate a rational connection between the facts and the choice not to prepare a supplemental EIS."  (Pl.'s Mot at 23:13-14.)  Plaintiff asserts four arguments in support of its conclusion: (1) where the RFEIS assumed a density of one pair per 32 acres, the Burnett study estimate one pair per 250 acres;

24

1 (2) contrary to the RFEIS's assumption, the study found no BBWO

2 in unburned forests; (3) USFS' SIR erroneously claimed that the

3 study was not designed to determine nest densities; (4) USFS

4 should have prepared a supplemental EIS because the Moonlight

5 RFEIS underestimated nest density and population numbers in the

6 moonlight fire area.  (Pl.'s Mot. 22:23-25:27.)

7        Defendants counter that the Burnett study's estimate of one

8 pair per 250 acres is irrelevant because the RFEIS actually

9 relied on a <u>range</u> of one pair per 32 acres to one pair per 500

10 acres.  Similarly, Defendants contend that they disagree with the

11 passive methodology used by the study; using USFS' preferred

12 methodology, it extrapolated from the Burnett study an estimation

13 one pair per 162 acres, not one pair per 250 acres.  Moreover,

14 USFS contends that nothing in the Burnett study demonstrates that

15 it was <u>specifically</u> designed to measure nest densities.  Finally,

16 Defendants contend that, although a range of BBWO density was

17 reported in the RFEIS, USFS did not rely on those numbers in its

18 conclusion; instead, USFS relied solely on its habitat

19 assessment.

20        NEPA regulations require that an agency prepare a supplement

21 to a final EIS if "[t]here are significant new circumstances or

22 information relevant to environmental concerns and bearing

23 on the proposed action or its impacts."  40 C.F.R.

24 § 1502.9(c)(1)(ii).  An EIS need not be supplemented every time

25 new information comes to light, but rather should be prepared if

26 the new information changes the range and scope of the effects

27 already considered in the previous NEPA document.  <u>Marsh</u>,

28 490 U.S. at 374.

In order to determine whether the new information is sufficiently significant to trigger the need for a supplemental EIS, the Forest Service prepares a supplemental information report ("SIR").  Forest Service Handbook 1909.15 § 18.1.  The agency's decision to forego preparation of a supplemental EIS is reviewed under the arbitrary and capricious standard.  Friends of the Clearwater v. Dombeck, 222 F.3d 552, 556 (9th Cir. 2000); see also Marsh, 490 U.S. at 375-76 ("We conclude that review of the narrow question before us whether the [agency's] determination that an [EIS] need not be supplemented should be set aside is controlled by the 'arbitrary and capricious' standard of § 706(2)(A).").  Resolution of this question "implicates substantial agency expertise" and courts "defer to the informed discretion of the responsible federal agencies."  Marsh, 490 U.S. at 376-77 (internal quotation marks and citation omitted).

As required by NEPA, in response to the Burnett study, USFS prepared a detailed SIR.  (AR 18682.)  The nine-page SIR concluded that, notwithstanding the Burnett study, "the range and scope of the effects evaluated in the previous environmental documentation remain the same."  (AR 186847.)

Applying the SIR to the facts of this case, the court finds the fact that the RFEIS estimated a range of one pair BBWO per 32 acres to one pair per 500 acres and still reached the conclusion that the Project would not unduly impact BBWO as detrimental to Plaintiff's claim.  (See AR 403-404 ["Assuming BBWO densities @ 3.2/40 ha in burned forest (1 pair/32 acres) . . . or 1 pair/500 acres . . . this habitat (snags in burned forest) potentially supports between 2 and 39 pairs of BBWOs between 2002 to 2007].)

Based on this analysis, USFS concluded that the project, which leaves "approximately 32,659 acres of suitable BBWO habitat, provides enough habitat to theoretically support an additional 65 to 1,020 pairs." (AR 404.)   Therefore, the Burnett study's estimate of one pair per 250 acres is essentially irrelevant, thus demonstrating that the decision not to prepare a supplemental EIS was neither arbitrary nor capricious.

Defendants alternative theories — as set forth in the SIR — are also availing.[11]   Specifically, Plaintiff fails to explain how the Burnett study's alleged conclusion on nest density bears on the RFEIS' conclusions that "the project would not alter the existing trend in the ecosystem component, nor would it lead to a change in the distribution of black-backed woodpecker across the Sierra Nevada bioregion." (AR 403.)   Specifically, the RFEIS did not rely on BBWO population, but rather on its analysis of suitable BBWO habitat.

///

///

///

///

///

///

_____

[11] The Court, however, finds that, contrary to Defendant's contention, it is unclear, whether the Burnett study was specifically designed to measure nest densities. The Burnett study directly mentions nest "density" in a table that compares nest density of various birds on private v. public land but does not mention it in any other capacity.   Regardless, the Court finds this disputed issue irrelevant to its conclusion that Defendants were not required to issue a supplemental EIS. Specifically, as set forth above, the RFEIS relied on the project's effect on the BBWO habitat, not nest density.

1   A scrupulous review of the RFEIS shows that the majority of the

2   analysis, and the ultimate conclusion, is focused on the amount

3   suitable BBWO habitat that would remain post-project.[12]  (See AR

4   401-404 [concluding that 62% of viable BBWO habitat would remain;

5   there would be short term population increase resulting from

6   habitat remaining; post-project, the analysis area still leaves

7   untreated the majority of suitable habitat and leaves more area

8   unharvested than harvested].)  Since the central factor

9   supporting USFS' conclusion regarding the project's impact on

10  BBWO on available BBWO habitat, not nest density, the Burnett

11  study was inconsequential; thus, NEPA did not require a

12  Supplemental EIR. In this instance, the Court does not find that

13  Defendants acted arbitrarily in reaching this conclusion because

14  there is a logical connection between the conclusion of the SIR

15  and the analysis contained in the RFEIS.

16      Finally, notwithstanding the foregoing, given the restraints

17  provided by the APA standard, the Court must defer to the

18  Agency's interpretation that the Burnett study did not provide an

19  accurate measure of BBWO nest densities because: "(1) it included

20  acreage from a fire that was too old to be considered suitable

21  black-backed woodpecker habitat;

22  ///

23

24      [12] The Court acknowledges Plaintiff's position that the
    RFEIS incorporated into its analysis the fact that the BBWO is
25  "widely distributed across recently burned forest stands in the
    10 Sierra Nevada national forests," and thus the Burnet study
26  would have an effect on the analysis set forth by the RFEIS.
    (AR 403.)   However, the explanation Defendants provided for the
27  inclusion of this information — that distribution information
    was only included to provide context — is neither arbitrary or
28  capricious, and thus, the Court must defer to the agency.

(2) the study was designed to detect a variety of bird species and some survey plots were located in areas that were not suitable Black-Back woodpecker habitat; and (3) the methodology used (passive point counts, rather than the call playback method typically used for maximum detection of [BBWO] to determine abundance) was not designed to determine the actual density of [BBWO]." (Def.'s Mot at 26:1-8.)  While Plaintiff might disagree with this analysis, in this so-called "battle of the experts," the Court must defer to the Agency's interpretation. See Carlton 626 F.3d at 473 (upholding the district court's conclusion that "such a 'battle of the experts' . . . did not establish a violation of NEPA.")  As such, the Court finds that Defendants' decision to not issue a supplemental EIS in light of the Burnett study did not violate NEPA.

In conclusion, the Court finds that Defendants acted neither arbitrarily nor capriciously in ensuring the scientific integrity of the project, responding to dissenting scientific opinion or declining to issue a supplemental EIS in light of the Burnett study.  The Court therefore GRANTS Defendants' motion for summary judgment as to each of Plaintiff's claims brought under NEPA.

**B.    NFMA**

While NEPA imposes strictly procedural requirements, NFMA imposes various substantive requirements.  NFMA mandates that the Secretary of Agriculture "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System."  16 U.S.C. § 1604(a).

1   USFS, which manages the System, develops land and resource

2   management plans pursuant to NFMA, and uses these forest plans to

3   "guide all natural resource management activities," including use

4   of the land for "outdoor recreation, range, timber, watershed,

5   wildlife and fish, and wilderness."  16 U.S.C. § 1604(e)(1);

6   36 C.F.R. § 219.1(b).  In developing forest plans, USFS must take

7   both environmental and commercial goals into account.  See e.g.,

8   16 U.S.C. § 1604(g); 36 C.F.R. § 219.1(a).  Forest planning

9   occurs at two levels: forest and project.  At the forest level,

10  USFS develops a "Forest Plan," which is a broad, long-term

11  programmatic planning document for an entire National Forest.

12  Each Forest Plan includes goals and objectives for individual

13  units of the forest and provides standards and guidelines for

14  management of forest resources.[13]

15      The central issue in this case is whether the 1988 PNF plan

16  requires USFS to analyze, and report, in the RFEIS, "the quantity

17  and quality of habitat that is necessary to sustain the viability

18  of the species in question and explain its methodology for

19  measuring this habitat."  McNair, 537 F.3d at 998.

20  ///

21

22  [13] Consistent with its obligations under NFMA, in 1982, the
    USFS adopted the PNF Plan.  In 2001, the USFS approved the Sierra
23  Nevada Forest Plan Amendment (the "2001 Framework"), which
    amended the management plans for all national forests in the
    Sierra Nevada, including the PNF Plan.  Then, in 2004, the USFS
24  supplemented the 2001 Framework, referred to as the "2004
    Framework," which also amended the Plans for all Sierra Nevada
25  national forests.  Finally, in 2007, the USFS amended the 2004
    Framework with the Management Indicator Species ("MIS") Amendment
26  ("2007 MIS Amendment") ("AR 10308").  The Forest Plan and all
    amendments rely on the 1982 version of the NFMA regulations.
27  36 C.F.R. § 219.  Because the instant Project lies within the
    PNF, it must be consistent with the PNF Plan, as amended by the
28  2001 and 2004 Frameworks as well as the 2007 MIS Amendment.

1    As a preliminary matter, Plaintiff asserts that the Ninth

2    Circuit opinion in <u>Carlton</u> — upholding the court's denial of a

3    preliminary injunction — which held that USFS is not required to

4    ensure viability of BBWO using this methodology, is not

5    controlling for two reasons: (1) the Carlton opinion only

6    concluded whether the "forest-wide" 2004 and 2007 amendments do

7    not require such a viability determination, but did not determine

8    whether the 1988 PNF contained the requirement; and (2) "the

9    <u>Carlton</u> decision is not controlling authority for the simple

10   reason that the resolution of a motion for preliminary injunction

11   does not equate to an adjudication of the merits."  (Pl.'s Mot.

12   at 16:4-8.)

13   Substantively, Plaintiff contends that the 1988 PNF Plan

14   incorporated the — now superseded[14] — 1982 NFMA regulations

15   which require such a viability determination.  Specifically,

16   Plaintiff points to the "management direction" portion of the PNF

17   Plan, which states that USFS is to "maintain at least viable

18   populations of all native vertebrate species through the use of

19   the Management Indicator Species."  (AR 10579.)  This language,

20   Plaintiff maintains, incorporates the 1982 regulations' habitat

21   viability requirement.

22   ///

23   ///

24   ///

25   ///

26

27   [14] <u>See</u> 36 C.F.R. pt. 219 (2010); <u>see also</u> <u>Ecology Ctr. v.</u>
<u>Castaneda</u>, 574 F.3d 652, 657 (9th Cir. 2009) ("The requirements
28   of the superseded 1982 Rule apply only to the <u>extent they were</u>
<u>incorporated into the forest plan</u>) (emphasis added).

1   Defendants counter that the "management direction" section

2   of the PNF plan does not incorporate the 1982 viability

3   requirement because that section of the plan only states

4   overarching "goals" but does not contain substantive

5   requirements.  Defendants maintain that, "although the 'Forest

6   Goals and Polices' may aspire to 'maintain habitat to support

7   viable populations of all . . . species,' it is the Standard and

8   Guidelines that provide the substantive provisions the Forest

9   Service must follow in furtherance of this goal," which lack any

10  viability language.[15]

11  In 1982, the Forest Service promulgated regulations

12  implementing NFMA.  The regulations required that "[f]ish and

13  wildlife habitat [on national forest lands] shall be managed

14  to maintain viable populations of existing native . . .

15  vertebrate species in the planning area."  36 C.F.R. § 219.19

16  (1982).  This requirement is known as the "wildlife viability

17  requirement," or "viability requirement" of the 1982 NFMA

18  regulations.  In 2000, the NFMA regulations were replaced with

19  new regulations, which state that previous requirements of the

20  1982 regulations, including the wildlife viability requirement,

21  are only enforceable to the extent they are incorporated into the

22  specific forest plan at issue.  Ecology Ctr. v. Castaneda,

23  574 F.3d 652, 657, 663-664 (9th Cir. 2009).

24  ///

25  ///

26

27  [15] Plaintiff does not allege that the "standards and
    guidelines" portion of the plan contains any viability
28  requirement.

According to the Ninth Circuit, if the 1988 PNF plan indeed incorporated the viability requirement of the 1982 regulations, USFS was required to determine both "the quantity and quality of habitat that is necessary to sustain the viability of the species in question," an undertaking USFS concedes it did not perform. McNair, 537 F.3d at 996.

Preliminarily, the court notes that Plaintiff's argument regarding the precedential impact of Carlton is specious. Carlton specifically refers to the "Plumas National Forest Plan" itself, not, as Plaintiff maintains, just the 2004 and 2007 forest-wide amendments: "Here, the Plumas National Forest Plan [as] amended in 2004 and 2007. . . . only requires distribution population monitoring [to] track changes in distribution of each MIS . . . by monitoring the changes in the presence of the species across a number of locations, but the sole MIS requirement that is applied at the project-level is the assessment of habitat for MIS." Carlton, 626 F.3d at 471.  It is clear that the Ninth Circuit was not only referring to the forest-wide amendments, but also specifically concluded that the PNF plan did not incorporate the viability requirement.

As a catch all, Plaintiff argues that this court's and the Ninth Circuit's opinions are irrelevant because a "motion for preliminary injunction does not equate to an adjudication on the merits."  Plaintiff is correct: the procedural posture and the standard governing the motion for preliminary injunction are entirely different than these motions for summary judgment, and thus, are not controlling.

///

1  Nevertheless, both the District Court and Ninth Circuit made
2  specific findings of fact and conclusions of law that are useful
3  guides to this court in determining the substantive merits of
4  Plaintiff's claims.  Thus, the Court finds highly persuasive both
5  courts' determination that the PNF plan did not incorporate the
6  1982 viability requirement.

7       Substantively, the Court finds the overall interpretation of
8  the plan to be ambiguous: on the one hand, the plan does contain
9  specific species viability language; on the other, Defendant
10  presents a compelling argument that "standards" and "guidelines"
11  denote substantive requirements whereas "management direction"
12  simply implies aspiration and does not create substantive
13  requirements.  Since the plan is ambiguous as to the viability
14  requirement, the Court must defer to the USFS' interpretation of
15  its own plan.  See Castaneda, 574 F.3d at 661 ("[A]ssuming the
16  Forest plan leaves some ambiguity . . . , we defer to the Forest
17  Service's reasonable interpretation of the Forest Plan's
18  requirements."  USFS' distinction between management direction
19  and substantive standards and guidelines is neither arbitrary nor
20  capricious; indeed, it is wholly reasonable.  As such, the Court
21  finds that Plaintiff has failed to establish the essential
22  elements of its claims under NFMA, and thus, Defendants are
23  entitled to judgment as a matter of law.
24  ///
25  ///
26  ///
27  ///
28  ///

34

**CONCLUSION**

For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED and Defendants' motion for summary judgment is granted in its entirety.  The clerk of the court is directed to close the file.

IT IS SO ORDERED.

Dated: March 28, 2012

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

35